(164 App. Div. 424)

PHŒNIX HERMETIC CO. v. FILTRINE MFG. CO. et al.

(Supreme Court, Appellate Division, Second Department.  November 27, 1914.)

1. SALES (§ 98)—EXCLUSIVE OPTIONS—ORDERS—ACTS CONSTITUTING ORDER.

 Where, after the execution of a contract by a manufacturer of filters for the exclusive sale of the filters to plaintiff, a corporation, at a stated schedule of prices, binding the manufacturer to fill all orders and to be ready to make deliveries at certain weekly rates, plaintiff's secretary verbally urged the manufacturer to increase its production and make up a larger stock, and approved the placing of an order for 50,000 filters with an outside concern, but no order for such filters was entered on the manufacturer's books, and there was no written confirmation, these verbal communications did not constitute an order for filters, entitling the manufacturer, upon the refusal of a tender of the filters, to rescind the contract, especially in view of the question as to the secretary's authority thus to vary the contract.

 [Ed. Note.—For other cases, see Sales, Cent. Dig. § 263 ; Dec. Dig. § 98.*]

2. SALES (§ 98*)—EXCLUSIVE OPTIONS—BREACH OF IMPLIED CONDITION.

 Under a contract by a manufacturer for an exclusive sale of filters to plaintiff at a stated schedule of prices, binding the manufacturer to fill all orders and be ready to make deliveries at certain weekly rates, and not to sell to any one else, and providing that after the second year the manufacturer might discontinue the agreement upon notice, unless plaintiff purchased annually a specified quantity of the filters, the contract otherwise to continue for 15 years, where plaintiff, during the first year of the contract term, discontinued its advertising of the filters, greatly reduced its selling force and its force of demonstrators, and directed the manufacturer to stop manufacture altogether, there was a breach by plaintiff of an implied condition of the contract, giving the manufacturer a right to terminate the contract and recover damages for the breach, since the law will imply a promise when equity and justice require a party to do the thing in question, though he never actually made the promise or agreement.

 [Ed. Note.—For other cases, see Sales, Cent. Dig. § 263 ; Dec. Dig. § 98.*]

 Thomas, J., dissenting.

Appeal from Trial Term, Kings County.

Action by the Phœnix Hermetic Company against the Filtrine Manufacturing Company and another.  From a judgment for defendants, and an order denying a new trial, plaintiff appeals.  Reversed, and new trial granted, unless defendants stipulate to reduce the recovery on their counterclaim.

Argued before JENKS, P. J., and THOMAS, CARR, STAPLETON, and PUTNAM, JJ.

William M. Chadbourne, of New York City (Albert F. Jaeckel, of New York City, on the brief), for appellant.

Thomas Downs, for respondents.

PER CURIAM.  Mr. George Kneuper, as the inventor, and the Filtrine Manufacturing Company, of which Mr. Kneuper was President, manufactured filters in Brooklyn.  On December 27, 1910, they entered into an agreement with the Phœnix Cap Company for an exclusive sale of their filters of the standard sizes (but excepting those which required special installation) at a stated schedule

of prices. The manufacturers agreed to fill all orders of the Phœnix Cap Company, also to be ready to make deliveries at certain weekly rates; for example, 1,000 weekly was to be the rate of delivery for the "Mountain Spring" filter—one of the principal patterns. The manufacturers also bound themselves not to sell directly or indirectly any filter, save through the Phœnix Cap Company; also not to license any one else to make these filters. They undertook to prosecute infringers, the costs to be borne equally, not exceeding $1,000 a year. The Phœnix Cap Company had an option to take over the manufacturing plant on a royalty basis. After the first year the Phœnix Cap Company could terminate the contract on 3 months' notice, then taking over any goods manufactured on its order; otherwise, the contract was to last for 15 years, except that after the second year, unless the third party (the Phœnix Cap Company) "purchases annually $30,000 worth of products of the first and second parties, said parties may discontinue the agreement after 3 months' notice in writing to said third party."

The day after execution of this instrument, Mr. Alexander, the secretary of the Phœnix Cap Company, had a personal interview with Mr. Kneuper, and urged that the manufacturers increase their production. Mr. Alexander then went to California and made some sales there. Upon his return in February, 1911, he again urged that a larger stock be made up. In March he was equally optimistic, and asked for larger production, in view of the more active distribution his company was planning. Defendants had placed an order with an outside house for the production of the Mountain Spring filter. Mr. Alexander approved of this large order for 50,000, so as to have an ample stock to meet the expected sales, and said the Phœnix Cap Company and the defendants would carry the thing with the responsibility divided equally. On April 6, 1911, the directors of the Phœnix Cap Company voted to spend $10,000 in advertising these filters. Eight salesmen were employed to cover New York and the vicinity. There had also been installed in different drug stores some three or four demonstrators to illustrate the actual operation of these filters.

In May the Phœnix Cap Company began negotiations with Mr. Giles, of Chicago, for a sale of the New York company to the Hermetic Closure Company, which, about June 20th, led to a reorganization or merger, forming the present plaintiff. Mr. Alexander resigned on June 20th, but stayed at the office until July 6th, when Mr. Huxley, from Chicago, took charge as manager. The new company first wished to enlarge the scope of the filter contract, so as to include special installations. When a draft of a proposed modification was submitted to defendants, Mr. Kneuper as a condition asked to have a minimum of yearly sales fixed. By July 18th these negotiations appear to have been dropped. Plaintiff also objected that some of the filters were lighter in construction than those earlier produced, and suggested some change in the design of the "Mountain Spring" filter.

Mr. Kneuper wrote on July 18th that the Filtrine Company had made up from $30,000 to $40,000 of filters, under the order of the Phœnix Cap Company, adding, "We have received no orders for

nearly a month, and are unwilling that there should be any further delay." Mr. Giles answered on same day that the plaintiff had "until the end of the third year to sell $30,000 worth of your filters, and we will certainly not order them faster than we sell them." The next day Mr. Kneuper replied that:

"The fair construction of the contract is that you shall go ahead and do your best to sell these goods, and make the joint venture as profitable to you and to us as is possible. That does not mean that you are to discharge all your salesmen and lie down on the contract and do nothing. It means energetic effort on your part to sell goods; that is the spirit of the agreement. You have done practically nothing for a month, and this course is most unsatisfactory to us. * * * We shall not hold the goods you have already ordered to be manufactured much longer, not beyond a reasonable time."

Defendant, about July 25th, tendered a truck load of its filters at plaintiff's office, which was declined. On July 26th defendants wrote, setting forth that the Phœnix Company had discharged its salesmen and incapacitated itself from carrying out the contract. It referred to the tender of goods yesterday and plaintiff's refusal, claiming that these acts were a breach, and that it therefore elected to terminate the contract and to hold the Phœnix Company for damages. The Phœnix Company replied that the letter had been turned over to Mr. Saxe, their attorney.

Up to June 20th the Phœnix Company had purchased filters and material, and its payments therefor up to July 14th amounted to $7,-733.02; its own sales of such filters in the month of July, up to the 26th, were over $2,000.

The present action was to recover $150,000 damages for breaking off the contract, to which defendants interposed a counterclaim for $22,592 damages for breach of contract, in that plaintiff intentionally, fraudulently, and without justification sought and compelled the defendants to terminate the contract, by withdrawing salesmen and discontinuing all advertising, and by changing the officers of the former company.

The issues, therefore, were: Who committed the first breach? Was the repudiation of July 26th justified?

[1] It seems to be admitted that all merchandise regularly ordered in writing had been paid for. The defendants' right to terminate rests on establishing inaction by plaintiff, such as puts on plaintiff a voluntary disability, by acts like the discharge of employés, and other neglects, amounting to a breach of the agreement. Against this, it is urged that all such omissions were within the plaintiff's rights—that the letter of the contract only fixed $30,000 as the annual sales for the third year, also that Alexander's so-called orders for $30,000 or $40,000 were simply general suggestions to have a large stock ready from which orders could be promptly filled. Considering, however, the unsatisfactory testimony as to these directions to manufacture more filters, the omission to enter any such order in the defendants' books, and the entire absence of any written confirmation, and the question whether Mr. Alexander had authority thus to vary the contract, we cannot find that this stock thus made up had been "or-

dered" by the plaintiff, so as to entitle defendants to tender the merchandise. Without written order or demand, and in the absence of any notice, the tender of this truck load was ineffective.

[2] The voluntary stoppage, however, of effort to sell, amounted to a breach of an implied condition. The Phœnix Company controlled the sole and entire output of the standard filters. It had the "Mountain Spring" filters stamped "The Phœnix Cap Co., Sole Distributors," which was the imprint on all these filters made after the contract. The Phœnix Company did not deal on a commission basis, but took the goods at stated price. The total stoppage of orders after June 20th, the discontinuance of advertising, reducing the selling force from eight to three and then to one, and the like reduction of demonstrators, with Mr. Giles' later direction to defendants to stop manufacture altogether, gave defendants a right to terminate the contract, under the doctrine of a breach of a promise legally implied. This is because the law will intend a promise, when equity and justice require the party to do the thing in question, even though it expressly appears that he never actually made the promise or agreement, which by such implication the law attributes to him. Scrantom v. Booth, 29 Barb. 171, 174; Genet v. Delaware & Hudson C. Co., 136 N. Y. 593, 32 N. E. 1078, 19 L. R. A. 127; Wilson v. Mechanical Orguinette Co., 170 N. Y. 542, 63 N. E. 550; Creamer v. Metropolitan Securities Co., 120 App. Div. 422, 429, 105 N. Y. Supp. 28. Especially does this apply in case the buyer himself creates the disability which prevents full performance on his part. Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Page on Contracts, § 1443.

A question arises as to the verdict on the counterclaim. The defendants' gross product could not be charged up against the plaintiff. The verdict on this basis stands in part unsupported, based on the considerations here stated. Taking the situation as it existed on July 26th, when defendants decided to end their relations with the plaintiff, we think their legal damages were not $7,500, a sum apparently based on the entire stock on hand, and even then not clearly established.

It follows that the judgment and order must be reversed, and a new trial granted, costs to abide the event, unless defendants stipulate to reduce their recovery on the counterclaim to $2,500, in which event the judgment, as so modified, and order, are affirmed, without costs. All concur, except THOMAS, J., who dissents.