The SOUTHLAND
CORPORATION, Plaintiff,

v.

Khawar N. MIR and Akbar
Ali, Defendants.

The SOUTHLAND
CORPORATION, Plaintiff,

v.

Asim NASIM, Defendant.

The SOUTHLAND
CORPORATION, Plaintiff,

v.

Khawar N. MIR and Rukhsana K.
Mir, Defendants.

Khawar N. MIR and Rukhsana K.
Mir, Plaintiffs,

v.

The SOUTHLAND
CORPORATION, Defendant.

Khawar N. MIR and Akbar
Ali, Plaintiffs,

v.

The SOUTHLAND
CORPORATION, Defendant.

Asim NASIM, Plaintiff,

v.

The SOUTHLAND
CORPORATION, Defendant.

Nos. CV 90–1375, CV 90–1377, CV 90–
1379 and CV 90–1460 to CV 90–1462.

United States District Court,
E.D. New York.

Sept. 19, 1990.

Borker & Sussman, New York City, for plaintiff Southland Corp.

Arnold J. Hauptman, Massapequa, N.Y., for Franchisees Mir, Ali and Nasim.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

The above named defendants are franchisees of 7–ELEVEN convenience stores under franchises granted by The Southland Corporation ("Southland") as follows (the dates indicating the date of the franchise agreement):

Mir/Ali 355 Boyle Road, Selden, N.Y. September 8, 1988 for a term of ten (10) years

Asim Nasim 2140 Motor Parkway, Hauppauge, N.Y. March 31, 1988 for a term of ten (10) years

Mir/Mir 725 Fulton Street, Farmingdale, N.Y. August 16, 1983, for a term of fifteen (15) years.

At the time the franchisees entered into the respective franchise agreements, they entered into security agreements. Southland offered the franchisees advances in order to enable them to purchase inventory required for the operation of the store. To secure the advances, the franchisees gave Southland a security interest in the inventory and in the proceeds of the sale of the inventory.

On April 24, 1990, Southland served each of the franchisees with a notice of termination of their franchise, without opportunity to cure the breach, fixing the termination date as April 27, 1990. Southland filed complaints in the office of the Clerk of this court on April 24, 1990, claiming fraud (Count I), and breach of contract (Count II), and seeking compensatory and punitive damages.

On April 27, 1990, Southland demanded payment of the indebtedness due under the security agreement and in default thereof demanded possession of the inventory and the proceeds resulting from the sale of the inventory.

On April 27, 1990, Southland filed an amended complaint, as of right, adding, *inter alia*, claims for possession of the inventory based on the security agreement (Count III).[1] Southland also moved for an order of seizure against all of the franchisees for the return of the inventory securing Southland's loan and for an order of attachment against Nasim.

On April 26, 1990, and April 27, 1990, the franchisees brought four separate actions in the New York State Supreme Court (the "State Court Actions") claiming a threatened violation of their franchise rights based upon a claimed ineffective notice of termination. The franchisees moved for a preliminary injunction by order to show cause which contained temporary restraining orders enjoining Southland from terminating the franchises. Southland removed the State Court Actions to this court.

We are presented with Southland's motion for orders of seizure and the franchisees' motions to preliminarily enjoin termination of the franchise agreements. On May 2, 18, 30 and 31, 1990, and June 8, 1990, the court conducted a hearing on the motions.[2]

---

1. On May 30, 1990, the court granted Southland leave to file a second amended complaint which added claimed violations subsequent to April 24, 1990, as grounds for termination of the franchise agreements.

2. The court also heard motions in *The Southland Corporation v. Jameel Bukhari* (CV 90–1378) and *Jameel Bukhari v. The Southland Corporation* (CV 90–1464) which are based on substantially the same franchise agreements and

The parties agree that the following facts are not in dispute: [3]

1. Southland is a Texas corporation with its principal place of business in Dallas, Texas. Second Amended Complaint ("Complaint"), ¶ 1. Southland maintains an office in the Eastern District of New York at 732 Smithtown Bypass, Smithtown, New York 11787. *Id.*

2. Southland operates and franchises the nationwide 7–ELEVEN retail chain of convenience stores. At present, there are some 6,900 stores in the nationwide 7–ELEVEN system, some 3,400 of which are operated directly by Southland, and about 3,500 of which are operated by individuals under franchises granted by Southland.

3. Southland is the plaintiff in four separate, but related,[4] actions, each of which was commenced by the filing of a complaint on April 24, 1990. Each of the four sets of defendants, three above named and Jameel Bukhari, operated a franchise in Nassau or Suffolk County on Long Island, New York.

4. The complaints filed April 24, 1990 asserted systematic fraud perpetrated against Southland by defendants through the improper use of money orders that was designed to misrepresent and conceal store revenues and to deprive Southland of its contractual share of profits of the stores.

5. Defendants Akbar Ali ("Ali") and Khawar N. Mir ("Mir") are both residents of the State of New York. Ali resides at 1028 N. Hamilton Avenue, Lindenhurst, New York 11758, and Mir resides at 18 Barbara Lane, Farmingdale, New York 11735.

6. Ali and Mir are defendants in CV 90–1375. Ali and Mir have been franchised to operate a 7–ELEVEN store (No. 2423–16299) located at 355 Boyle Road, Selden, New York 11784, pursuant to a store franchise agreement dated September 8, 1988.

7. Mir and his wife, Rukhsana K. Mir (the "Mirs"), also have been franchised to operate a 7–ELEVEN store (No. 2422–23862) located at 725 Fulton Street, Farmingdale, New York 11735, pursuant to a store franchise agreement dated August 16, 1983.

8. Asim Nasim ("Nasim"), defendant in CV 90–1377, resides at 320 Nassau Road, Apartment 1E, Huntington, New York 11743. Nasim has been franchised to operate a 7–ELEVEN store (No. 2423–16050) located at 2140 Motor Parkway, Hauppauge, New York 11787, pursuant to a store franchise agreement dated March 31, 1988.

9. Jameel Bukhari ("Bukhari"), defendant in CV 90–1378, resides at 24 Thomas Drive, Hauppauge, New York 11788. Bukhari has been franchised to operate a 7–ELEVEN store (No. 2423–11211) located at 722 Townline Road, Hauppauge, New York 11787, pursuant to a store franchise agreement dated September 26, 1988.

10. The four franchised stores that are the subject of these actions are situated in two of the three markets that comprise the New York Division of Southland. One of such markets encompasses that part of Long Island lying roughly west of the Sagtikos Expressway, much of which is in Nassau County. There are sixty-seven 7–ELEVEN stores in that market including the one operated by the Mirs in Farmingdale. Gary Padilla ("Padilla") is the Nassau Market Manager.

11. The other market at issue encompasses that part of Long Island lying roughly east of the Sagtikos Expressway, all of which is in Suffolk County. There are seventy-two 7–ELEVEN stores in that market, including the other three operated

---

security agreements. *Bukhari* presents an additional issue, i.e., lack of knowledge and/or participation in the claimed violations. The court issues a separate memorandum of decision and order incorporating the findings of fact and conclusions of law made here. 748 F.Supp. 988.

3. Southland submitted proposed findings of fact. The court invited the franchisees to note which are in dispute. The absence of numerical sequence indicates proposed findings that franchisees dispute. Where relevant to the issues presented, the court makes the "additional findings" below.

4. *See* note 2, *supra.*

by the defendants here. The Suffolk Market Manager is Robert S. Cadigan ("Cadigan").

12. The amount of damages sought by Southland, plus the value of the personal and real property which it seeks to recover, in each of the actions, exceeds $50,000, exclusive of interest and costs.

13. On April 26, 1990, and April 27, 1990, the franchisees commenced the State Court Actions seeking preliminary injunctions against termination of the franchise agreements, and in each case, a temporary stay was obtained *ex parte*.

14. On April 27, 1990, and April 30, 1990, the State Court Actions were removed to this court. On April 27, 1990, Southland also filed, as of right, an amended complaint and filed applications for orders of seizure (replevin) against all of the franchisees for the return of the inventory securing Southland's loan and for an order of attachment against Nasim.

15. On May 2, 18, 30, and 31, 1990, and June 8, 1990, an evidentiary hearing was conducted on (a) the applications of the franchisees for preliminary injunctions against termination of their respective store franchise agreements and (b) Southland's applications for an order of seizure (replevin) and an order of attachment.

16. On May 17, 1990, Southland issued and delivered to each of the franchisees between two and four discrete notices of termination of each of the respective store franchise agreements encompassing the following:

(i) failure to report merchandise inventory cash purchases;

(ii) failure to report merchandise purchases cash rebates;

(iii) failure to record or report lottery ticket sales, with a resulting improper reduction in merchandise sales;

(iv) failure to record or report lottery commissions income; and

(v) failure to record or report amusement games income.

17. On May 21, 1990, Southland moved by Order to Show Cause to further amend its complaint. On May 30, 1990, the Court granted Southland's motion, Southland's second amended complaint was deemed served as of such date, and proof was received concerning the events described in the May 17, 1990 notices of termination.

*The 7-ELEVEN Franchising System*

18. Southland's essential financial interest is in receiving a percentage of the Gross Profit (Net Sales less Cost of Goods Sold) derived from operation of a franchised store, which percentage is designated in the store franchise agreement as the 7-ELEVEN Charge. The Net Income in which the franchisee has the sole interest is the amount remaining after deducting Operating Expenses (such as payroll and similar expenses) and the 7-ELEVEN Charge from the Gross Profit. Operating Expenses do not include store repairs, replacement of equipment, insurance, real property taxes, any rental charge, electricity, heat or other utility costs, all of which are borne by Southland.

19. In addition to providing the franchisee with a store ready to be operated, bookkeeping services and Southland's extensive expertise relating to successful operation of 7-ELEVEN stores, Southland, if a franchisee so requests, also finances the operation of the store under the terms of the store franchise agreement. Although franchisees are free to obtain their own financing, most franchisees, including defendants, utilize Southland's offer to finance the franchisee's operation. To secure the obligation owed to Southland under such financing, a franchisee, as the defendants herein have done, grants Southland a security interest in the franchisee's inventory and proceeds thereof.

20. Prior to the opening of a store, the franchisee purchases an initial inventory, with the franchisee paying only part of the purchase price for the initial inventory and Southland financing the balance. The amount financed by Southland and owed by the franchisee to Southland is maintained in an account known as the Open Account. Subsequent purchases, expenses and revenues flow through the Open Account. Essentially, the Open Account is a running working capital account which reflects the

cash operation of the store. The balance of the Open Account at any point in time represents that amount of money which Southland has loaned or advanced to the franchisee to finance the operation of the 7–ELEVEN store.

21. After operation of a store commences, the franchisee is obligated to ring up accurately, on a cash register provided by Southland, all sales of merchandise (with those transactions that are subject to sales tax and those that are not being separately identified), money orders, cigarettes, lottery tickets, and other sales; cash payments to vendors and casual labor, and other cash transactions. In the two Markets in which the defendants' stores are situated, the franchised stores use cash registers manufactured by Norand[5]; they have separate keys for taxable sales, non-taxable sales, money orders, cigarettes, lottery tickets, etc. To ring up a sale, the amount of each item is entered on the register and the appropriate key is depressed. This in turn registers the amount of each sale. The cash register automatically maintains a running total for all entries on each key and prints out a summary tape of those totals as part of the daily reporting a franchisee is required to make to Southland.

22. A franchisee also is required to deposit on a daily basis the cash received from each day's operation of the store. These deposits are made to a bank account designated by Southland and Southland credits the franchisee for the deposits in reduction of the outstanding balance of the Open Account.

23. The franchisee is required to furnish Southland with a daily Cash Report indicating the amount of sales for the day, the amount of cash deposited and any additions or deductions to or from cash that affects the daily deposit. A tape from the cash register that summarizes, by categories of its various keys, the day's entries into it, and tissue copies of all money orders issued by the store during the day being reported, are required to be attached to the Cash Report. Money orders bear consecutive serial numbers, and the tissue copies therefore allow Southland to account for all of them, avoiding loss from theft, non-reporting, etc. The tissue copy does not show the payee of the money order because the payee is filled in by the purchasers after purchase of the money order. The tissue copy does, however, show the dollar amount of the money order issued.

24. It is from the cash register summary tape that much of the information required for the Cash Report is derived. After the cash register summary tape is printed out, the register's various subcategories of information (other than a running grand total of all sales) are "zeroed out," so that the next day's summary tape will reflect only that day's transactions.

25. The daily Cash Report is prepared and signed by the franchisee, or one of the franchisee's trusted employees or other agents, and is the only device used to report daily sales.[6] It is at the heart of the Southland accounting system. When it is received by Southland's accounting department, information from it is entered into the accounting records maintained by Southland on computer. Although the tissue copies of all money orders issued are routinely reviewed to assure that all money order issuances are reported, the cash register summary tape, which generally is received folded up and stapled to the back of the Cash Report, is not routinely compared with the Cash Report to assure that numbers have been accurately transcribed onto the Cash Report.

26. When a franchisee purchases merchandise and supplies, the related invoice, bill or statement may be submitted, together with a Receiving and Inventory Transaction Report, to Southland for recording and direct payment by Southland. These payments, as well as the payments made by Southland for Operating Expenses, are

---

5. Some of the stores also were furnished with an additional NCR register for the recording of the "Lotto" sales. No Norand summary tape is generated by such register.

6. Lotto ticket reports are generated by the Lotto machines.

charged to the franchisee through the Open Account, the balance of which is increased by the amount of the expenditures. Southland pays the related invoice, bill or statement only so long as it is willing to provide Open Account financing to the franchisee. Southland encourages invoices to be submitted to it for payment, since it aids accurate and orderly accounting for the store. Alternatively, payment may be made directly by the franchisee at the store, in cash or by draft drawn on an account designated by Southland, in which case the invoice, bill or statement must be submitted to Southland for verification and recording. If the purchase is paid by cash, it is reflected on the Cash Report (to account for the reduced amount of the deposit made to the store's bank account) and the related invoice, bill or statement is attached. If the purchase is paid by draft, it is reflected on the Receiving and Inventory Transactions report submitted to Southland and the related invoice, bill or statement is attached.

27. Southland prepares monthly financial statements for each store from Southland's bookkeeping records and from information supplied by the franchisee, particularly the store's daily Cash Reports. The monthly financial statements include a profit and loss statement for the month and an updated balance sheet for the store, as well as comparative information from prior periods or cumulative information for the year to date. Based on these financial reports the 7–ELEVEN Charge, through which Southland receives its share of the Gross Profits of the store, is calculated. The financial reports also update the outstanding balance of the Open Account.

28. Southland operates what is known as a retail method of inventory accounting system. When a 7–ELEVEN store commences operations, a physical count of all inventory is made and the inventory is valued "at retail," i.e., at the retail selling price of each item of inventory. The retail selling prices are determined by the franchisee, who reports them to Southland for accounting purposes; Southland must rely on the franchisee's honesty in reporting to Southland the retail selling prices. This Opening Inventory is the initial balance in the Retail Book Inventory maintained in the store's accounting records by Southland. When a franchisee purchases merchandise for a store, the invoice, bill or statement is transmitted to Southland together with the value of the purchased merchandise at retail (again, Southland must rely on the honesty of its franchisee in this retail valuation). Southland then increases Retail Book Inventory by the retail value of the merchandise purchased. Sales of merchandise to customers of the store reduce its Retail Book Inventory. Although the first entry on the daily Cash Report for a store is the gross amount of sales for the day, that number is actually a calculated number derived last from the other reported categories of cash transactions. Southland charges the gross amount of sales against Retail Book Inventory on the store's accounting records. Because of the large variety of items carried by a 7–ELEVEN store, it is not practicable to keep a running count, by computer or otherwise, of each kind of item sold. Thus, the accounting system must rely upon the integrity of the amounts and categories of sales reported by each store on its daily Cash Reports.

29. To maintain the Retail Book Inventory as an accurate figure for the inventory that actually is present in a store, periodic physical counts of the inventory present in a store are taken and any variance becomes an adjustment to the Retail Book Inventory accounting record. Variances can arise from any one or more of a number of factors. Thefts by customers or employees, the taking of merchandise by a franchisee for personal use, and sales of merchandise that are not rung up on the cash register are some of the factors that can lead to variances that cause Inventory Shortages, i.e., physical counts showing that less inventory actually is present than is shown on the accounting records for the Retail Book Inventory.

30. Under the terms of the store franchise agreement, a franchisee is responsible for all Inventory Shortages. Any Inventory Shortage is charged directly to the

franchisee's account (not at retail value, but at its cost); Southland does not bear any of the loss (other than the lost 7–ELEVEN Charge that would have been generated by sale of the lost Inventory). An Inventory Shortage may be covered up by a franchisee's purchasing or otherwise bringing merchandise into a store but not submitting the related invoice, bill or statement to Southland. A physical count of inventory thus could match the amount shown for Retail Book Inventory in the accounting records. This would hide from detection, for example, sales of merchandise not being rung up on the cash register and in effect would permit the franchisee to operate a separate independent business within the store. The effect of such a scheme on Southland would be to deprive it of the 7–ELEVEN Charge, its contractual share of the Gross Profit of the store.

*The Relevant Provisions of the Store Franchise Agreement*

31. Defendants are required by the store franchise agreement to:

> prepare and furnish to 7–ELEVEN, on forms and at times acceptable to and as requested by 7–ELEVEN: (i) daily summaries of Purchases; (ii) daily reports of Receipts.... FRANCHISEE also shall deliver or furnish to 7–ELEVEN copies of ... invoices for Purchases.... (¶ 10).

The requirement regarding summaries of Purchases is encompassed by the Receiving and Inventory Transactions Report and the requirement regarding reports of Receipts is encompassed by the Cash Report. The store franchise agreement contains, at page 4 of Exhibit E to it, the following definitions:

> 'Purchases' means all of FRANCHISEE's purchases of merchandise for sale from the Store.
>
> 'Receipts' means all sales proceeds (whether cash, check, vendor draft, credit instrument, or other evidence of receipt), [or] money order revenues ... received by FRANCHISEE ... from FRANCHISEE's operation of the Store.

Under the heading "Franchisee's Additional Covenants," the store franchise agreement provides:

> FRANCHISEE shall: ... (v) cause all sales of Inventory to be properly recorded at the time of sale at the retail prices set by FRANCHISEE ... (¶ 17).

Exhibit E to the store franchise agreement provides:

> 'Inventory' means all merchandise for sale from the store ...

32. Although the store franchise agreement provides for termination upon 45–days' or 30–days' prior notice upon the occurrence of many other kinds of Material Breach (as defined), the agreement provides that it may be terminated by Southland:

> Upon 3 Business Days (excluding weekends and legal holidays) notice to FRANCHISEE, and subject to FRANCHISEE's right to cure as set forth herein, in the event that: (i) FRANCHISEE's Net Worth is less than the minimum ...; (ii) FRANCHISEE fails to properly record, deposit, deliver, or expend and report Receipts or to deliver ... invoices or other reports of Purchases ... (¶ 28, subpart d).

The "right to cure" referred to in the foregoing provision permits the franchisee two initial lapses in failing to observe the Net Worth or the recording, deposit, delivery and reporting requirements of the store franchise agreement, or otherwise involving a Material Breach:

> Unless otherwise specified, and if FRANCHISEE has not previously been served with two notices of termination for any Material Breach within the three (3) years prior to the occurrence of a third Material Breach, FRANCHISEE shall have the right to cure any Material Breach set forth above prior to the expiration of the notice period for termination due to that Material Breach ... by taking such actions as 7–ELEVEN may reasonably determine to be necessary to restore 7–ELEVEN to substantially the same condition it would have held but for FRANCHISEE's breach. (¶ 28).

As a matter of company policy, Southland has extended the termination provisions of its current form of store franchise agree-

ment, discussed more fully below, to all its existing franchisees and has stipulated that such provision applies in this case.

*Discovery of a Money Order Scheme*

33. In January 1990 a management trainee of Southland undergoing his accounting training in the Suffolk Market noted that on an almost daily basis the store at Selden, New York, franchised to Ali and Mir, would submit tissue copies for one or more money orders that had been issued but not properly rung up on the Norand cash register. The franchisees had covered up this fact by adjusting the numbers written onto the daily Cash Report (although they varied from the numbers printed on the Norand daily summary tape stapled to the back of the Cash Report) in order to reduce merchandise sales and to increase money order sales by the appropriate amount. A spot check was conducted and copies of several money orders that had been fully negotiated and paid were requested from American Express.

34. Copies of the requested money orders were received from American Express during the first two weeks in February 1990. It was determined that the money orders were payable to vendors. As a result, a review of the money order practices in all stores in the Suffolk and Nassau markets was conducted.

35. In the beginning of March 1990, it appeared to Southland that five stores in Nassau and Suffolk County were involved in a scheme relating to the improper recording and reporting of money orders. At a meeting with the Division Manager on March 12, 1990, the two Market Managers sought and obtained permission for the involvement of counsel; investigation of the particulars and extent of the problem continued.

36. At the time of commencement of the lawsuits, the investigation of the money order scheme was incomplete. It was continuing as of May 31, 1990.

*Defendants' Money Order Scheme to Defraud Southland*

37. Each of the franchised stores perpetrated a fraudulent scheme against South-land through the use of money orders. Between January 1989 and February 1990, each of the franchised stores failed to record from 152 (in the case of the Bukhari store) to 418 (in the case of Nasim) money orders, aggregating from $22,884 (in the case of the Bukhari store) to $76,343 (in the case of Nasim). Each such money order was issued at the respective store without receipt of money in payment thereof, and was utilized to purchase merchandise or pay other costs or expenses of the defendants' store or of the defendants personally, none of which merchandise, purchases, costs or expenses was reported to South-land. In an attempt to cover such discrepancy, records were falsified, particularly the Cash Reports that are vital to South-land's accounting system.

38. Three of the franchisees (all except for Bukhari) entered into stipulations, dated May 9, 1990, that are identical except as to the amounts involved, and contain outright admissions by such franchisees that they altered records and: (a) reported to Southland less cash merchandise sales receipts than were in fact received; and (b) in an attempt to cover-up such discrepancy, reported to Southland that a greater number of money orders, equal in dollar amount to the dollar amount of unreported sales, were sold than were in fact sold.

39. In CV 90–1375 (Mir and Ali) the stipulated number of falsely reported money orders issued totalled 300, aggregating $49,477 in unreported sales between March 1989 and February 1990. In CV 90–1377 (Nasim) the stipulated number of falsely reported money orders issued totalled 418, aggregating $76,343 in unreported sales between March 1989 and February 1990. In CV 90–1379 (Mir and Mir) the stipulated number of falsely reported money orders issued totalled 203, aggregating $30,428 in unreported sales between January 1989 and February 1990.

40. In those actions it was further stipulated that the money orders were diverted to each franchisee's personal use and to the purchase of inventory to replace goods sold but not reported. The purchase of such replacement inventory was necessary to

cover-up the fact that inventory had been sold without the sales being reported. The final paragraph of the stipulations reads as follows:

[T]he reduction of merchandise sales, as reported in the cash reports as aforesaid, had the effect of reducing cash sales proceeds from true merchandise sales, thereby reducing gross profits of the defendants' 7–ELEVEN franchised store and depriving Southland of its portion thereof as designated in the Store Franchise Agreement between the parties.

41. The fourth franchisee, Jameel Bukhari, defendant in CV 90–1378, does not deny the existence of the scheme[7] but attempts to absolve himself of responsibility for the theft by his assertion that he personally was unaware of and was not a direct participant in the fraud that allegedly was carried out by his authorized agents and employees.

42. From February 13, 1990 through March 31, 1990, Nasim issued an additional $22,817.00 in money orders that were not properly recorded or reported.

43. The money order scheme at Nasim's and Bukhari's stores utilized "white-out" typewriter correcting fluid in an effort to cover up the scheme. In each of those stores, many of the Norand daily cash register tapes, which are annexed to the Cash Report, had numbers manually written on them for the other categories of merchandise sales and money order sales. As was apparent from the original tapes, the numbers actually printed by the cash register were covered up by white-out, and new numbers were manually written over the true numbers after the fluid had hardened. The true numbers usually could be read through the reverse side of the tapes.

*The Status of the Loans from Southland as of March 31, 1990*

44. On March 31, 1990, the date of the most recent month-end financial statements prior to commencement of these actions, the loan payable from the Mirs to Southland was $46,759.01. This loan was se-

cured, at that date, by merchandise inventory with a value, at cost, of $51,031.60.

45. On March 31, 1990, the loan payable from Nasim to Southland was $54,155.80. This loan was secured, at that date, by merchandise inventory with a value, at cost, of $64,323.64.

46. On March 31, 1990, the loan payable from Ali/Mir to Southland was $29,173.51. This loan was secured, at that date, by merchandise inventory with a value, at cost, of $48,504.33.

47. On March 31, 1990, the loan payable from Bukhari to Southland was $32,911.13. This loan was secured, at that date, by merchandise inventory with a value, at cost, of $43,959.39.

*Southland's Franchising Process*

48. Prior to an applicant's being accepted as a 7–ELEVEN franchisee, the applicant is presented with substantial documentation and is required to complete successfully the qualification and training process. A minimum of three months generally is required to complete this process.

49. The franchising and training process may be illustrated by that experienced by Bukhari. On June 15, 1988, Bukhari received a recruiting brochure. On June 30, 1988, an initial interview between Bukhari and a Southland representative took place. In the course of that interview, Bukhari received a Uniform Franchise Offering Circular. On such date, Bukhari also received a number of documents describing the 7–ELEVEN franchise and the risks inherent in becoming a franchisee. Among the documents initially received by Bukhari was a Qualification Report for Franchise Applicants in which the prospective franchisee must provide certain information regarding his employment history and personal finances. In his financial statement, Bukhari set forth total assets of $492,468 and total liabilities of only $329.

50. On August 10, 1988, a second interview was conducted with Bukhari. On September 6, 1988, a further interview was conducted in which Bukhari was given the proposed 7–ELEVEN Store Franchise

---

7. Bukhari only denies *knowledge* of the exist-   ence of the scheme.

Agreement and a booklet entitled "Here are the Facts," which was a summary of the historical financial information for the store in which Bukhari had expressed an interest. A Business Plan was prepared by Bukhari. In the Business Plan, Bukhari acknowledged that honesty is an ingredient that Southland looks for in a franchisee. Honesty is a critical factor for Southland in determining whether an applicant is suitable for becoming a franchisee.

51. On September 15, 1988, Bukhari acknowledged receipt of the completed copy of the 7-ELEVEN Store Franchise Agreement and all other forms relating to the franchising of Store 11211. Such documents are received at least five business days before the franchisee is permitted to sign such documents.

52. The training for a new franchisee in Nassau or Suffolk County on Long Island consists of one week in Southland's Huntington, Long Island training store, where the prospective franchisee learns the basics of a store operation, such as operating the cash register, the various machinery and equipment, handling customers and checking in vendors. Such training is followed by one week in a classroom at Southland's training facility in Allentown, Pennsylvania, where the franchisee learns more about the paper work necessary in the operation of a convenience store. Following the one week classroom training, the franchisee returns to the Huntington, Long Island training store for two more weeks of on-the-job training.

*Bukhari's Claim that the Scams Were Carried Out By His (Admittedly Authorized) Agents without His Knowledge or Participation*

53. The store franchised to Bukhari opened under Bukhari's personal stewardship on December 16, 1988. During March 1989, Bukhari traveled to Pakistan for his father's funeral and to handle matters relating to his father's estate, returning to the United States on May 31, 1989. During that interval, Nasim managed the store on Bukhari's behalf. From and after Bukhari's return on May 31, 1989, until October or November 1989, because of personal problems and problems with his other business interests, Bukhari was present at his 7-ELEVEN store only a few times a week during the morning and evening hours. During this period, Charlotte Pamphile, Southland's field representative, visited the store three times a week and would see Bukhari there at least once a week. When Bukhari was not in the store, Ahmad Raza (also known as Tony) generally would oversee the store's operation.

54. During the period following Bukhari's return from Pakistan on May 31, 1989, through the date of the commencement of this action on April 24, 1990, Nasim and his father, Nasim Hussain, continued to participate in the operation of Bukhari's store, including preparation and submission of the daily Cash Reports. In addition to Nasim and Hussain, Ahmad Raza was authorized to sign Cash Reports. Raza remains in Bukhari's employ to date.

55. On April 19, 1990, there was a fire in Nasim's store, and consequently it closed for repairs. Immediately thereafter, Nasim and his father went to work in Bukhari's store.

56. In October 1989, Bukhari was informed by Southland's field representative that someone at the store had altered an invoice that had been submitted to Southland. Although Bukhari's store maintained a video surveillance system, Bukhari did not view the video tape to determine who was responsible for the alteration.

57. Bukhari blamed Nasim and Raza for the notice of termination received by Bukhari relating to the deposit of a worthless check.

58. According to Bukhari, he was informed on March 26, 1990, by a Southland representative, that Nasim was "milking him," and he asked for assistance and proof of such claim. Nonetheless, Bukhari permitted Nasim to continue to assist in the operation of the store until at least the commencement of the lawsuit, and Raza continues in Bukhari's employ.

59. The store franchise agreement between Bukhari and Southland provides, in relevant part:

FRANCHISEE shall be an independent contractor and shall control the manner and means of the operation of the Store and exercise complete control over and responsibility for ... the conduct of FRANCHISEE's agents and employees, including, but not limited to, the day-to-day operations of the Store and all Store employees. (¶ 21).

Paragraph 33 of such store franchise agreement reads in relevant part:

> *33. Personal Qualification.* This Agreement is being entered into by 7–ELEVEN with [Bukhari] ... upon the representation and agreement that [Bukhari] will be the FRANCHISEE(s) of and will actively and substantially participate in the operation of the Store and will have full managerial authority and responsibility for the operation of the Store. No changes in the ownership and/or control of the franchise shall be made without the prior written approval of 7–ELEVEN.

## MISCELLANEOUS

60. When a franchisee falls below his/her required minimum Net Worth, Southland gives Market Managers various options. Each case of a franchisee being below equity or his/her minimum Net Worth is handled on an individual basis. In known cases of dishonesty, Southland has not issued curable notices of termination for being below equity or minimum Net Worth.

61. Nasim, Mir/Ali and Bukhari each purchased an existing franchised store. Each purchased the good will in their respective franchises from the prior franchisee. Nasim and Mir/Ali each paid the prior owner $100,000 and Bukhari paid the prior owner $75,000.

62. In connection with their goodwill purchases, Nasim, Ali/Mir and Bukhari each acknowledged in writing to Southland the following:

> The amount you pay the present franchisee for the premium or "goodwill" will not be considered by [Southland] as part of your investment in the franchise or an asset or operating expense of the franchise business.
>
> *     *     *     *     *     *
>
> Your premium or goodwill payment will have no effect on your right or the right of [Southland] to terminate your Agreement pursuant to its terms.
>
> *     *     *     *     *     *
>
> Upon expiration or termination of your Agreement, you will not be compensated by [7–ELEVEN] for any premium goodwill.

63. On April 30, 1990, Nasim was below his minimum required equity, or Net Worth, by about $7,500. To cure this fault, Nasim deposited $8,000 in cash (currency) to Southland.

64. If the franchisees were to be permitted to remain within the 7–ELEVEN system despite their violations, the cost to Southland to monitor their activities would be substantial.

We further find:

(a) On April 24, 1990, each of the franchisees was served with a notice of termination, without opportunity to cure the breach, of their franchise agreements fixing the termination date as April 27, 1990, and indicating as grounds, *inter alia:*

> FRANCHISEE fails to properly record, deposit, deliver or expend and report Receipts or to deliver invoices or other reports of purchases. (Second Notice) [and]
>
> FRANCHISEE fails to notify 7–ELEVEN in an accurate and timely manner of Purchases, Receipts, discounts, allowances, and/or premiums received by FRANCHISEE, or FRANCHISEE's retail selling prices.

(b) Khawar Mir received rebates in cash on merchandise he purchased for both stores, e.g., 4% discount for purchases from Conti Wholesale (health and beauty aids). (Testimony of Patrick T. Hinchy, Tr. pp. 303, 325, 327). Mir failed to report such rebates to Southland.

(c) All defendants purchased inventory for cash and failed to report the purchases to Southland.

## DISCUSSION

Southland seeks an order of seizure based on the termination of the franchise agreement as a default under the security agreement. (Reply Memo p. 23, n. 20). In this application, it does not press its right to repayment on demand and possession of collateral, absent such termination. We discuss the right of seizure based on termination the franchise agreement, since the discussion also bears on the franchisee's right to a preliminary injunction.[8] However, for the reasons stated at the end of this discussion, we find Southland has a right to demand payment of the indebtedness due under the security agreement and to the seizure of the inventory as therein provided. We find no showing of bad faith by Southland to bar seizure. N.Y.U.C.C. § 1–208; *Sheppard Fed. Credit Union v. Palmer*, 408 F.2d 1369, 1371 (5th Cir.1969); *Blaine v. G.M.A.C.*, 82 Misc.2d 653, 370 N.Y.S.2d 323, 327 (Monroe Co. Ct.1975).

### Substantial Breach

Defendants concede that the April 24, 1990 notices of termination "set forth a valid ground for termination. [Their position is] that such notices were curable under the very express terms of the agreements...." (Memorandum, p. 54).

Our discussion starts with the termination provisions in the franchise agreements.

Paragraph 28 of the franchise agreements grants Southland the right to terminate the agreements upon 30 days notice (or longer if required by law) upon the happening of any one or more certain events, i.e., condemnation of the property, casualty damage which cannot be repaired or replaced within 30 days, etc.

Southland has the right to terminate the franchise agreements upon at least 72 hours notice (or longer if required by law) for specified breaches including "Net Worth is less than the minimum ..." and "FRANCHISEE fails to properly record, deposit, deliver, or expend and report Re-

ceipts or to deliver invoices or other reports of Purchases."

Subsequent to the execution of the subject franchise agreements, Southland modified its form for store franchise agreements (including its termination rights for failure to maintain a minimum net worth, and for failure to properly record, deposit, deliver, or expend and report receipts or to deliver invoices or other reports of purchase) by providing for a right to cure prior to the expiration of the notice period for termination (such period for the breaches here is three Business Days).[9] This right to cure is available "if Franchisee has not previously been served with two notices of termination for any Material Breach within the three (3) years prior to the occurrence of a third Material Breach...." As a matter of company policy, Southland extended the modified provisions to all of its franchisees.

■ The modified termination and curing provisions of paragraph 28 of the franchise agreement read:

This Agreement may be terminated by 7-ELEVEN (subject to FRANCHISEE's right to cure as set forth below) for the occurrence of any one or more of the following events (each of which FRANCHISEE acknowledges is a Material Breach and constitutes good cause for termination):

a. Upon 45 calendar days notice to FRANCHISEE, and subject to FRANCHISEE's right to cure as set forth herein, in the event that: (i) FRANCHISEE fails to operate the Store at least the hours set forth in Exhibit D, unless said reduction in hours of operation: (A) is the result of governmental regulation (B) does not result in less than the hours of operation required for a Minimum Hour Operation, and (C) is not directly or indirectly caused by FRANCHISEE's acts or failure to act (any reduction in hours of operation that satisfy these three criteria

---

8. Paragraph 32 of the franchise agreement specifies that the agreement is governed by and construed according to the laws of the state where the store is located, here New York law.

9. We note that other specified breaches, e.g., filing a petition in bankruptcy, are not curable.

shall result in an increase in the 7–ELEVEN Charge as determined by Paragraph (j) of Exhibit D to the Agreement); (ii) FRANCHISEE fails to use standardized trade-marked containers; (iii) FRANCHISEE fails to comply with any agreement (including a master lease pertaining to the Store or Equipment) binding 7–ELEVEN; (iv) FRANCHISEE fails to use the Store or Equipment solely in connection with FRANCHISEE's operation of the Store; (v) FRANCHISEE fails properly to maintain the Store and Equipment; (vi) FRANCHISEE fails to obtain the prior written consent of 7–ELEVEN to make additions to the Store or Equipment or discontinue use pursuant to the 7–ELEVEN System of any of the equipment; (vii) FRANCHISEE fails to remit insurance proceeds to 7–ELEVEN, which proceeds are due and owing to 7–ELEVEN pursuant to the terms of the Agreement; (viii) FRANCHISEE fails to indemnify 7–ELEVEN as required under the terms and conditions of Paragraph 16 of the Agreement; (ix) FRANCHISEE fails to provide any records or reports required by 7–ELEVEN or fails to cooperate in obtaining information from FRANCHISEE's vendors; (x) FRANCHISEE fails to comply with any provisions of Paragraph 33 hereof; or (xi) FRANCHISEE fails to comply with the quality or other reasonable operating standards as from time to time established and set forth in the Foodservice Operations Manual, where applicable.

b. Upon 30 calendar days notice to FRANCHISEE, and subject to FRANCHISEE's right to cure as set forth herein, in the event that (i) Net Worth is less than the minimum determined pursuant to Paragraph 13 of the Agreement, but more than an amount equal to one-half of the dollar amount of FRANCHISEE's minimum Net Worth or $10,000, whichever is greater; (ii) FRANCHISEE improperly uses, through advertising or otherwise, or jeopardizes the goodwill of the Service Mark, the Store, the 7–Eleven System, or the 7–Eleven Image; (iii) FRANCHISEE purchases or sells any product bearing the Service Mark which has been obtained from a source not authorized to produce or deal in such goods, the purchase of which by FRANCHISEE has been duly reported to 7–ELEVEN; (iv) FRANCHISEE fails to pay timely any taxes or debts connected with the Store which FRANCHISEE is obligated to pay or a tax lien is imposed upon the FRANCHISEE which affects the Store; (v) FRANCHISEE fails to maintain worker's compensation coverage; (vi) FRANCHISEE fails to maintain an Inventory of a type, quantity, quality and variety consistent with the 7–Eleven Image, (vii) FRANCHISEE fails to notify 7–ELEVEN in an accurate and timely manner of discounts, allowances or premiums received by FRANCHISEE, or FRANCHISEE's retail selling prices; (viii) FRANCHISEE fails to obtain or continue any license, permit, or bond necessary, in 7–ELEVEN's opinion, for FRANCHISEE's operation of the Store; (ix) FRANCHISEE violates or fails to comply with any governmental law, rule, regulation, ordinance or order relating to the operation of the Store (specifically including, but not limited to, those relating to the sale of alcoholic beverages); (x) FRANCHISEE fails to repay the loan from 7–ELEVEN in accordance with the Agreement in the event the unpaid balance in the Open Account becomes immediately due and payable; or (xi) FRANCHISEE fails to pay the 7–ELEVEN Charge when due.

c. Upon 30 calendar days notice to FRANCHISEE, and with no right to cure, in the event that (i) a voluntary or involuntary petition in bankruptcy is filed by or against FRANCHISEE, FRANCHISEE makes an assignment for the benefit of creditors, or a receiver or trustee is appointed; (ii) FRANCHISEE attempts to encumber, transfer, or assign, in part or in whole, any interest under the Agreement in

breach of the terms and conditions set forth in Paragraph 27 of the Agreement; (iii) FRANCHISEE is convicted of, or pleads "Nolo Contendere" to, a felony not involving moral turpitude; (iv) FRANCHISEE fails to maintain an independent contractor relationship with 7–ELEVEN; (v) FRANCHISEE purchases or sells any product bearing the Service Mark which has been obtained from a source not authorized to produce or deal in such goods, the purchase of which by FRANCHISEE has not been duly reported to 7–ELEVEN; or (vi) FRANCHISEE misrepresents, misstates, or fails or omits to provide information required as a part of the qualification process.

d. Upon 3 Business Days (excluding weekends and legal holidays) notice to FRANCHISEE, and subject to FRANCHISEE's right to cure as set forth herein, in the event that: (i) FRANCHISEE's Net Worth is less than the minimum determined pursuant to Paragraph 13 of the Agreement and less than an amount equal to one-half of the dollar amount of FRANCHISEE's minimum Net Worth or $10,000, whichever is greater; (ii) FRANCHISEE fails to properly record, deposit, deliver, or expend and report Receipts or to deliver deposit slips, cash reports and all supporting documents, receipts for cash purchases, and invoices or other reports of Purchases; (iii) FRANCHISEE, at any time during Normal Operating Hours, fails to permit any Audit provided for in Paragraph 12 of the Agreement or denies access to any part of the Store, Equipment, Inventory, Receipts, cash register fund, cash register receipts or readings, amusement machine, banking and other equipment readings, money order blanks, bank drafts, or Store supplies.

e. Upon 3 Business Days notice to FRANCHISEE, and with no right to cure, in the event that (i) FRANCHISEE vacates, deserts or otherwise abandons the Store, provided that, immediately upon 7–ELEVEN's determination that the Store has been abandoned, 7–ELEVEN may take possession of the Store pursuant to the provisions of Paragraph 17 hereof and operate the Store for FRANCHISEE's benefit during such notice period; or (ii) a FRANCHISEE is convicted of, or pleads nolo contendere to any charge which involves moral turpitude.

Unless otherwise specified, and if FRANCHISEE has not previously been served with two notices of termination for any Material Breach within the three (3) years prior to the occurrence of a third Material Breach, FRANCHISEE shall have the right to cure any Material Breach set forth above prior to the expiration of the notice period for termination due to that Material Breach (or such shorter period as may be imposed by law or by any agreement to which 7–ELEVEN is a party), by taking such actions as 7–ELEVEN may reasonably determine to be necessary to restore 7–ELEVEN to substantially the same condition it would have held but for FRANCHISEE's breach.

\* \* \* \* \* \*

Southland prepared a form of franchisee agreement for the defendants which was substantially the same form it required all franchisees to sign. Southland did not tolerate any changes or departures from the exact language of the agreement form. It is a general principle of contract law that ambiguities in the terms of a contract are resolved against the preparer of the contract. *151 West Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 472 N.Y.S.2d 909, 910, 460 N.E.2d 1344, 1344–45 (1984). In *Interested Underwriters at Lloyds v. Ducor's, Inc.*, 103 A.D.2d 76, 478 N.Y.S.2d 285, 288 (1st Dep't 1984), *aff'd*, 65 N.Y.2d 647, 491 N.Y.S.2d 620, 481 N.E.2d 252 (1985), the court summarized this principle under New York law:

"[W]here there is ambiguity in the terms of a contract prepared by one of the parties, 'it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against' such party." (*Rentways,*

*Inc. v. O'Neill Milk & Cream Co., supra,* 308 N.Y. [342] at 348, 126 N.E.2d 271 [1955]; citing *Mutual Ins. Co. v. Hurni Co.,* 263 U.S. 167, 174, 44 S.Ct. 90 [91], 68 L.Ed. 235 [1923].) This rule has been applied even where the language in question appears in a form used, but not originally drafted, by one of the parties to the contract. (*See A & Z Appliances, Inc. v. Electric Burglar Alarm Co.,* 90 A.D.2d 802, 455 N.Y.S.2d 674 [2nd Dept. 1982].) In this case defendant's use of a form lease qualified it as the drafter of the contract, since it had the opportunity in the first instance to eliminate any ambiguity. Thus, any uncertainty as to the meaning of the waiver clause should be resolved in the tenant's favor.

It is also clear under New York law that options to terminate tenures granted by the provisions of a contract should be strictly construed. *Greenwich Village Assocs. v. Salle,* 110 A.D.2d 111, 493 N.Y.S.2d 461, 462 (1st Dep't 1985); *Leighton's, Inc. v. Century Circuit, Inc.,* 95 A.D.2d 681, 463 N.Y.S.2d 790, 792 (1st Dep't 1983).

On the other hand, if a fair reading of the termination clause grants Southland a right to terminate, the right must be recognized. In *Brainerd Mfg. Co. v. Dewey Garden Lanes, Inc.,* 78 A.D.2d 365, 435 N.Y.S.2d 417, 419 (4th Dep't), *appeal dismissed,* 53 N.Y.2d 701, 439 N.Y.S.2d 109, 421 N.E.2d 504 (1981), the court, in holding that a tenant's violation of its obligation to insure the leased building was a material breach, stated:

> To be sure, the termination of the lease will result in substantial loss to the tenant, but financial hardship standing alone does not create a penalty or forfeiture which would warrant equitable relief....
>
> "Should we hold that the termination of this lease is harsh and inequitable, then the same conclusion can be reached in every instance where a landlord exercises his contractual rights, and, in that event, the right of termination or any

other right specified in a lease would be rendered meaningless and ineffectual." *Id.* (quoting *First Nat'l. Stores, Inc. v. Yellowstone Shopping Center, Inc.,* 21 N.Y.2d 630, 638, 290 N.Y.S.2d 721, 725–26, 237 N.E.2d 868, 870–71 (1968)).

It is clear that the termination and curing provision grants Southland the right to terminate and deny the franchisees the right to cure for substantial violations. (¶ 28c, e). That the list in the provision of events and violations that are not curable fails to refer to fraud does not preclude the parties having intended that termination for fraud was without the right to cure:

> "Unless a contract provision for termination for breach is in terms exclusive, it is a cumulative remedy and does not bar the ordinary remedy of termination for 'a breach which is material, or which goes to the root of the matter or essence of the contract.'"

*Olin Corp. v. Central Indus., Inc.,* 576 F.2d 642, 647 (5th Cir.1978) (citations omitted) (emphasis deleted) (adopting the "Williston" view and rejecting the "Corbin" view);[10] *L.K. Comstock & Co. v. United Engineers & Constructors, Inc.,* 880 F.2d 219, 232 (9th Cir.1989).

We turn then to the question of the nature of the violation as it relates to the purposes of the franchise agreements. Does the money order scam violate Southland's rights under the contract so that it "goes to the root of the matter or essence of the contract"?

A fair reading of the purpose of the contract implies a covenant not to engage in schemes that deprive Southland of its contractual right to its share of the gross profits. *See Lyon v. Pollard,* 87 U.S. (20 Wall.) 403, 406, 22 L.Ed. 361 (1874) (if defendant rendered herself incapable of performing her contractual duties, plaintiff may rescind or terminate the contract immediately and was not bound to continue it pursuant to the contract's thirty day notice requirement). Southland's right to approximately 50% of the sales were for the ser-

---

**10.** The court in *Olin* interpreted Mississippi law. We believe the principle is generally accepted and is the law of New York.

vices it rendered to the franchisees' businesses. Any reduction in the reported sales of merchandise would deprive Southland of about 50% of the gross profit of the reduced sales. Franchisees underreported sales in the amount of false statements of money orders sold. The duration and extent of the scam establishes beyond any doubt that each franchisee entered into a scheme knowingly and willfully to deprive Southland of its right to 50% of the gross profits as follows:

*Mir & Ali* from March 1989 to February 1990 issued 300 money orders totalling $49,477.

*Nasim* from March 1989 to February 1990 issued 418 money orders totaling $76,343.

*Mir & Mir* from January 1989 to February 1990 issued 203 monthly orders totalling $30,428.

The franchisees received no cash for the issuance of the money orders and "balanced" their sales by reporting a reduction in sales in the amounts of the false money orders issued.

We find that the violations cited by Southland in the April 24, 1990 notices for terminating the franchisees (court's finding (a), above), as well as the failure to report rebates (court's finding (b), above), and the failure to report cash purchases of inventory (court's finding (c), above), were committed for the limited purpose of supporting the knowing and willful scheme to deprive Southland of its contract rights through the money order scam.

We find that under New York law the money order scam went to the "root of the matter or essence of the contract." *See Clarke Contracting Co. v. City of New York*, 229 N.Y. 413, 420, 128 N.E. 241 (1920) (where contract provided that ashes, rubbish and street sweepings would be delivered and picked up at fourteen dumps by contractor, furnishing only ten dumps was a substantial breach "which lay at the basis of the entire contract"); *Phoenix Hermetic Co. v. Filtrine Mfg. Co.*, 164 A.D. 424, 150 N.Y.S. 193, 196 (1914) (discontinuance of advertising, reducing selling force and a general stoppage of effort to sell resulting in failure to submit orders for filters "gave defendants a right to terminate the contract, under the doctrine of a breach of a promise legally implied"). *See also Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 59 (2d Cir.1984) (applying the Petroleum Marketing Practices Act which confers upon a franchisee a right to notice and opportunity to cure, the court held that selling misbranded gasoline was a breach "so serious as to undermine the entire relationship" between the parties such that notice and opportunity to cure were not required).

The franchise rights of the franchisees terminated on April 27, 1990 in accordance with the notices of April 24, 1990. Discussion of the effect of the notice of termination served on May 17, 1990 is therefore unnecessary.

Southland is directed to continue its relationship with the franchisees for a period of twenty (20) days from date and to such time as the stay provided in the orders of seizure has expired.

*Franchisees' Claim of Waiver*

■ In January 1990, a management trainee of Southland noted that the store franchised to Ali and Mir submitted tissue copies showing the issuance of money orders which were not reported on the Norand cash register tape. The franchisees had concealed the fraud by reducing the amount of merchandise sales, and by showing the reduced amount as money orders issued, in their daily Cash Reports. When Robert Cadigan, Southland's market manager for the subject region of Suffolk County, learned of the activity, he asked American Express for copies of money orders negotiated in the franchised stores in his area of supervision. During the first two weeks of February, Southland received copies of money orders issued from the various stores from January 1st to the first two weeks in February. Southland's Markets' Accounting Office analyzed the daily Cash Reports of the various stores in light of the information contained in the copies of the suspected money orders. A force of more than fifteen employees working beyond the usual hours of the work week, including evenings and weekends, exam-

ined and analyzed the Cash Reports that revealed the money order scheme. In the beginning of March, Southland had evidence that five stores in Nassau and Suffolk Counties each participated in their own scheme of improperly recording and reporting money orders. Four franchisees are the subjects of this consolidated action; the action against the fifth store was discontinued. On March 12, Cadigan and Gary Padilla (market manager of the Nassau stores) met with their division manager and decided to consult Southland's counsel on what course of action to take.

On April 24, each of the franchisees was served with a notice of termination of their respective franchisees without opportunity to cure the breach. Actions were commenced on that day in this court. Southland continued to examine and analyze the daily Cash Reports to the date of the service of notices of termination, the date of the commencement of the lawsuits, and subsequent thereto.

Franchisees claim that Cadigan and Padilla had determined in the latter part of February 1990 that the franchise agreements had been violated, and that the delay of Southland in not serving notice of termination until April 24, and accepting the benefits of the agreements during such period of delay, constituted a waiver of Southland's right to terminate the franchises. The "benefit" Southland is claimed to have received was the approximate 50% of gross revenues to which Southland was *entitled* under the franchise agreements during the period from mid February to April 24—approximately $20,000 to $38,000 per month from each franchisee.

Southland's claims are not for rescission of the franchise agreements because of *fraud in the inducement.* The complaints allege claims for fraud, breach of contract, recovery of inventory under the security agreements, and recovery of the sums due under the security agreements, and seek compensatory damages and possession of the premises occupied by the franchisees. Southland does not seek rescission of the franchise agreement.

Under New York law the obligation to advise a contracting party of a substantial breach differs with the nature of the claim. In *Richard v. Credit Suisse,* 242 N.Y. 346, 152 N.E. 110 (1926) (Cardozo, J.), the court held:

> There is a distinction between rescission for fraud, which goes upon the theory that a contract is to be treated as nonexistent for lack of true assent, and rescission for abandonment, which goes upon the theory that a contract is avoided for nonperformance though valid in its origin. In the one situation, notice of rescission must follow promptly upon discovery of the fraud. This at least will be assumed, though there may be exceptions even here. "What promptness of action a court may reasonably exact * * * must depend in large measure upon the effect of lapse of time without disaffirmance, upon those whose rights are sought to be divested." In the other situation, which in the view of learned authors is not properly to be characterized as an instance of rescission at all, notice may be given at any time within the period of the statute of limitations unless delay would be inequitable.

*Id.* (citations omitted). *See N.Y. Tel. Co. v. Jamestown Tel. Corp.,* 282 N.Y. 365, 372–73, 26 N.E.2d 295 (1940); *Big Top Stores, Inc. v. Ardsley Toy Shoppe, Ltd.,* 64 Misc.2d 894, 315 N.Y.S.2d 897, 904 (S.Ct. Westchester 1970), *aff'd,* 36 A.D.2d 582, 318 N.Y.S.2d 924 (2d Dep't 1971).

In *Passaic Valley Sewerage Com'rs. v. Holbrook, Cabot & Rollins Corp.,* 6 F.2d 721 (3d Cir.), *cert. denied,* 269 U.S. 582, 46 S.Ct. 107, 70 L.Ed. 423 (1925), Holbrook contractors sued for labor performed in constructing a terminal chamber and sewage tunnel. Holbrook relied on the representations of the Commissioners as to the subsurface conditions, but when Holbrook started its work under the contract (as successful bidder) it found the subsurface condition not to be as represented. Within a reasonable time thereafter, Holbrook disclosed the condition to the Commissioners but continued to dig. "After going still farther in the work to ascertain with certainty the exact earth materials, it found

nowhere the cemented Triassic formation which the contract drawings indicated would be found everywhere. This corporation then rescinded the contract on the grounds of breach of warranty, misrepresentation, mistake and fraud, and brought this suit on quantum meruit...." *Id.* at 722–23.

The court, noting the need to investigate in order to bring an action for rescission, stated:

> When it started to work, it did not find the conditions as represented. If it had attempted to rescind the contract immediately we doubt that it could have prevailed because a rescission to be valid must be based on a material ground for such action. What was a material ground in work of this magnitude could be determined only by some investigation.... The underground conditions which it discovered in its operations had to be substantially and materially different from what had been represented before the contractor's right to rescind would arise.... Of course, a reservation of a right to rescind when the duty to rescind is immediate is of no avail, *but the duty to rescind does not arise until the ground for rescission has been established.* This occurred late in the spring of 1923, and in July the contractor acted. Did it wait too long? In work of some kind a delay of that length would obviously amount to a waiver. But ... the magnitude of the work here involved ... render[s] it impossible to say that a delay of about six months after discovering that the conditions were different from what had been represented was an unreasonable time within which to exercise the right of rescission.

*Id.* at 724–25 (emphasis added).

We find that the claimed two month delay in termination, during which Southland continued its investigation of the money order fraud scam and consulted with its counsel to determine what course of action to take, was not an "unreasonable time within which to exercise the right of rescission," *Passaic Valley, supra,* and was not "inequitable," *Richard, supra.* In reaching this conclusion we have considered:

(1) the nature of the breach. The franchisees and/or the authorized employees at the franchised stores knowingly, intentionally and willfully committed the fraud;

(2) benefits to Southland were not enhanced by the failure to disclose before April 24 since Southland merely received its contractual share of the gross profits;

(3) the franchisees were not prejudiced by the delay in notice that their scheme was uncovered;

(4) it was reasonable for Southland to make reasonably sure that it had a substantial basis to support a claim for breach of contract and fraud before disclosing the facts to the franchisees;

(5) when Southland first suspected a scheme to defraud among a few franchisees, it was reasonable to investigate the method of doing business by franchisees in the New York Division of Southland which comprises sixty-seven 7–ELEVEN stores in Nassau County and seventy-two 7–ELEVEN stores in Suffolk County. The time to make such an investigation, from January 1990 to the time Padilla and Cadigan decided to consult with counsel, on March 12, is not unreasonable;

(6) the time to gather the additional proof of the money order scheme and other violations, and draw the legal documents in order to start the lawsuits on April 24 was not unreasonable;

(7) Southland conducted its investigation expeditiously and in good faith.

Southland did not waive its right to bring the instant action by its failure to notify the defendant franchisees of its substantial violations prior to April 24, 1990.

*Seizure of Inventory*

■ The Second Amended Complaint seeks "an Order permitting Southland to replevy the secured inventory and proceeds of the Store" (Count IV) pursuant to the security agreements between Southland and the individual franchisees. (¶¶ 8 and 9).

As previously stated, upon the opening of a store under the franchise agreement, Southland provides financing of the initial inventory. The amount financed is placed in an Open Account through which subsequent purchases, expenses, and revenues flow. The balance of such account, at any point in time, represents the amount of money owed by the franchisee to Southland. The security agreement provides in pertinent part:

1. FRANCHISEES hereby grant a continuing security interest in 7–ELEVEN's [Southland's] favor upon all of the present and hereafter acquired inventory, and the proceeds thereof. The term "inventory" includes all goods held for sale at the Store (including all goods and supplies customarily classified as inventory and all such chattels hereafter acquired by FRANCHISEES by way of substitution, replacement, return, repossession or otherwise); and all additions and accessions thereto....

2. 7–ELEVEN's [Southland's] security interest shall secure: (i) any advances which 7–ELEVEN may make hereunder or under the Franchise Agreement; (ii) any other indebtedness which Franchisees may from time to time owe 7–ELEVEN, fixed on contingent, whether arising under the Franchise Agreement or after the expiration or termination thereof....

3. FRANCHISEES agree that the making of advances is always wholly discretionary on 7–ELEVEN's part, and that 7–ELEVEN shall be the sole judge of the amount of such advances and of the total of such advances to be outstanding at any particular time. All such advances shall be repayable on demand as, and bear interest at the rate, specified in the Franchise Agreement.

\* \* \* \* \* \*

5. FRANCHISEES' default in the payment or performance of any obligation or undertaking on FRANCHISEES' part hereunder or FRANCHISEES' default in the payment or performance of any obligation contained in the Franchise Agreement shall be an event of default hereun-

der.... Upon any such event of default, ... 7–ELEVEN shall have, in addition to all rights and remedies of a secured party under the Commercial Code of the State in which the Store is located ..., the following rights and remedies: (i) 7–ELEVEN may peaceably by 7–ELEVEN's own means or with judicial assistance enter FRANCHISEES' ... premises and take possession of the inventory, ... and FRANCHISEES will not resist or interfere with such action....

By letter dated April 27, 1990, Southland demanded payment of the debt of each franchisee and demanded possession of the inventory on failure to repay. The demand for possession of the inventory was repeated in a notice dated May 17, 1990.

The security agreement gave Southland the right to possession of the inventory. N.Y.U.C.C. § 9–503 ("Unless otherwise agreed a secured party has on default the right to take possession of the collateral"); *In re Yale Express System, Inc.,* 370 F.2d 433, 437 (2d Cir.1966) ("the secured party has the right upon default by the debtor to take possession of the collateral [N.Y.U.C.C. § 9–503] and to sell, lease or otherwise dispose of it, applying the proceeds to the indebtedness [N.Y.U.C.C. § 9–504]"); *Honeywell Information Systs., Inc. v. Demographic Systs., Inc.,* 396 F.Supp. 273, 277 (S.D.N.Y.1975) (same); *Gen. Motors Acceptance Corp. v. Cabrera,* 117 Misc.2d 1050, 459 N.Y.S.2d 665, 666 (S.Ct.Westchester 1982) (same).

Southland's motion for orders of seizure is granted pursuant to Fed.R.Civ.P. 64 (providing that seizure of property is available in the manner provided by the law of the state in which the district court is held, here C.P.L.R. § 7102). Orders of shall issue authorizing Southland to take possession of the inventories on the premises of the respective franchisees and directing said franchisees not to resist or interfere with the seizures.

Execution of the seizure orders are stayed for twenty (20) days from date to afford franchisees the opportunity to seek a further stay or other relief from the Second Circuit Court of Appeals.

*Motion for Order of Attachment*

Southland's motion for an order of attachment against the property of Nasim is denied. Southland has failed to establish any ground for such relief. *See* C.P.L.R. § 6201

*The Removed Actions*

■ It is well established that the standard for granting preliminary injunctive relief is a showing by the moving party "that it is likely to suffer possible irreparable injury if the injunction is not granted and 'either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.'" *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (quoting *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982)).

The franchisees have shown that they will suffer possible irreparable injury because the loss of their businesses is "incapable of being fully remedied by monetary damages." *Id.* We find, however, that since the violation is substantial and not curable, and that Southland has a right to demand payment of the indebtedness and seize the inventory as collateral to apply to the debt due Southland, there is neither "a likelihood of success on the merits" nor "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Id.*

The motions for preliminary injunctive relief are denied, and it is

SO ORDERED.

*Order of Seizure*

The parties are directed to settle an order on two (2) days notice authorizing seizure of the inventory in the franchisees' stores and the proceeds of sales of inventory in accordance with this memorandum of decision, and it is

SO ORDERED.