**THE SOUTHLAND CORPORATION,**
Plaintiff,

v.

**Richard FROELICH, Defendant.**

**No. 97–CV–1487 (JS).**

United States District Court,
E.D. New York.

March 19, 1999.

Stephen Sussman, Lebensfeld Borker & Sussman LLP, New York City, for plaintiff.

Jonathan Fisher, Lefkowitz & Edelstein, New York City, for defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Pending before the Court are the objections of Plaintiff, The Southland Corporation ("Southland"), to the February 26, 1998 Report and Recommendation of Magistrate Judge Viktor V. Pohorelsky. The Report recommended that this Court deny both Southland's motion for a preliminary injunction, and Defendant Richard Froelich's ("Froelich") motion for injunctive relief. Upon *de novo* review of the report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the Court adopts the recommendation to deny Froelich's motion, but declines to adopt the recommendation to deny Southland's motion.

1. Southland also brought this action against another franchisee, Thomas Hudson. Pursuant to a stipulation approved on June 9, 1997, Hudson is no longer part of this case. Hudson is necessarily mentioned in this opinion because his presence in the events giving rise to this lawsuit is relevant to the determinations made herein.

2. The complaint states causes of action for fraud, breach of contract, federal trademark infringement, common law trademark infringement, unfair competition, trademark di-

## PROCEDURAL BACKGROUND

Southland initiated this action on March 27, 1997 against defendant Richard Froelich,[1] the operator of one of Southland's well-known 7–Eleven franchises. The complaint contains twelve causes of action, ten of which pertain to Froelich.[2]

On April 9, 1997, Southland moved by Order to Show Cause ("OSC") for a preliminary injunction, pursuant to Fed. R.Civ.P. 65. Through the OSC, Southland sought to enjoin Froelich from using Southland's 7–Eleven service marks, trade dress, trade name, and trademarks during the pendency of the action. The OSC also sought to compel Froelich to vacate and surrender the premises of his franchise 7–Eleven store, located at Peconic Street and First Avenue in Lakeland, New York. Southland further sought, pursuant to Fed.R.Civ.P. 64, to seize from Froelich and deliver to Southland the inventory and other goods held for sale, and also the equipment that had been leased to the store.

On June 24 and 25, 1997, Magistrate Judge Pohorelsky conducted an evidentiary hearing on Southland's motion for a preliminary injunction.[3] Prior to a decision being rendered, Southland brought a supplemental order to show cause asserting additional grounds for the issuance of the injunction. Magistrate Judge Pohorelsky conducted additional hearings on December 2 and 3, 1997. Approximately three weeks later, Froelich cross-moved by order to show cause for an injunction compelling Southland to permit him to sell his interest in the Peconic Street 7–Eleven store. That application also was referred

lution, and payment of a debt. Southland also seeks a declaratory judgment that its termination of Froelich's franchise was lawful; a mandatory injunction directing Froelich to quit possession of his store, equipment and inventory; recovery of the inventory subject to Southland's security interests; and ejectment of Froelich from the premises.

3. Hearings also were conducted on July 3, 1997 relating to the testimony of Mohammed Younis, and on July 16, 1997 relating to the order to show cause.

to Magistrate Judge Pohorelsky, but no further evidentiary hearings were held.

The magistrate judge issued his Report and Recommendation on February 26, 1998, recommending that both motions for injunctive relief be denied. On March 16, 1998, Southland filed its objections to the Report and Recommendation. Froelich did not object to the Report and Recommendation, and did not reply to Southland's objections. Therefore, the recommendation to deny Froelich's motion for injunctive relief is ADOPTED in its entirety, and the magistrate judge's recommendation to deny Southland's application for a preliminary injunction is considered solely on the basis of Southland's submissions to the Court.

## LEGAL STANDARDS

### A. Standard of Review of Magistrate Judge Pohorelsky's Report and Recommendation

Pursuant to Fed.R.Civ.P. 72(c), a party objecting to the recommended disposition of a matter may file specific, written objections to the magistrate judge's report and recommendation. "The district judge to whom the case is assigned shall make a de novo determination upon the record ... [and] may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed. R.Civ.P. 72(c).

### B. Standard for Issuance of a Preliminary Injunction

■ The issuance of a preliminary injunction in the Second Circuit is dependent upon the movant's demonstration of (1) irreparable harm *and* (2) either a likelihood of success on the merits, *or* a sufficiently serious question as to the merits of the case to make them a fair ground for litigation *and* a balance of hardships tipping decidedly in its favor. *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995). Such relief is

extraordinary and should not be granted indiscriminately. *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). "Irreparable harm" means injury that is actual and imminent. *Tom Doherty Assoc.,* 60 F.3d at 37. If a monetary award will provide adequate compensation for the injury suffered, a preliminary injunction should not issue. *Id.* at 37–38.

■ However, where the requested preliminary injunction will do more than preserve the status quo, the court "should require a more substantial showing of likelihood of success" on the merits. *S.E.C. v. Cavanagh,* 155 F.3d 129, 136 (2d Cir.1998) (quoting *S.E.C. v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir.1990)). In other words, the moving party must demonstrate a. clear or substantial likelihood of success on the merits

where (1) the injunction sought 'will alter, rather than maintain, the status quo'—*i.e.,* is properly characterized as a "mandatory" rather than "prohibitory" injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.

*Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (quoting *Tom Doherty Assoc.,* 60 F.3d at 33–34); *see also Koppell v. New York State Bd. of Elections,* 153 F.3d 95, 96 (2d Cir.1998).

■ Upon consideration of an application for a preliminary injunction, the court must follow the requirements of Fed. R.Civ.P. 52(a), and set forth its findings of fact and conclusions of law. *Inverness Corp. v. Whitehall Lab.,* 819 F.2d 48, 49 (2d Cir.1987). This rule "serves several purposes. First, it aids the appellate court in understanding the ground or basis for the trial court's decision [and][s]econd, the rule encourages the trial judge to ascertain the facts with due care and render a decision in accord with the evidence and the law." *Davis v. New York City Hous.*

*Auth.*, 166 F.3d 432, 433–34 (2d Cir.1999) (citations omitted).

Therefore, the Court's findings of fact, as ascertained from the parties' pleadings, affidavits, memoranda of law, and the extensive hearing transcripts, are set forth below. The Court's conclusions of law are also set forth in the Discussion section that follows.

## FINDINGS OF FACT

1. Southland is a Texas corporation with its principal place of business in Dallas, Texas. Complaint ("Cplt."), ¶ 1. Southland maintains an office in the Eastern District of New York at 135 Maxess Road, Melville, New York. *Id.*

2. Southland operates and franchises the nationwide 7–Eleven chain of retail convenience stores. Cplt., ¶ 6.

3. Froelich is a resident of Suffolk County, New York and in July 1996 was granted a franchise to operate a 7–Eleven store ("Froelich Store") at Peconic Street and First Avenue in Lakeland, New York (store number 2423–16539). Cplt., ¶ 8; June 24 Tr., at 7.[4]

4. The Froelich Store is located in Market 2423, which encompasses that part of Long Island lying roughly east of the Sagtikos Expressway, all of which is in Suffolk County. There are eighty-one 7–Eleven stores in Market 2423. The Market Manager is Robert Cadigan. June 24 Tr., at 6.

5. Prior to opening his own 7–Eleven franchise, Froelich worked for approximately fifteen years at a 7–Eleven store operated by former defendant Thomas Hudson ("Hudson Store"), located on Hospital Road in East Patchogue, New York. June 24 Tr., at 7, 124–25; June 25 Tr., at 13–14.

6. Froelich has a college degree in business management and has an accounting background. June 24 Tr., at 125–27; Selected Exhibits Submitted by Plaintiff in Support of its Objections ("Pl.Ex.") 3, at 181.

7. In late January 1997, an investigation was commenced by Southland concerning the operation of both the Froelich Store and the Hudson Store. June 24 Tr., at 17–21. That investigation revealed to Southland that for many years at the Hudson Store, and at the Froelich Store since shortly after Froelich began operating that store, merchandise sales had been fraudulently reduced. June 24 Tr., at 19–20, 26–28, 84–85, 107–116, 142–43; Pl.Ex. 8.

8. This under reporting of merchandise sales, the gross profit of which Southland shares with its franchisees, was carried out by means of a scheme which consisted of Froelich's (and Hudson's) exaggeration of Instant Lotto sales—which are deducted from total sales to insure proper reporting of merchandise sales—and the deducting of such exaggerated Instant Lotto sales from total sales, thereby under reporting merchandise sales to the extent of the exaggerated sales. June 24 Tr., at 19–20, 26–28, 84–85, 107–116, 142–43; Pl.Ex. 8.

9. The scheme operated as follows, by way of example. If total sales, in a hypothetical day, were $3000, of which $500 represented actual Instant Lotto sales, the proper reporting would be: total sales less Instant Lotto sales equals total merchandise sales ($3000 less $500 equals $2500). Under the franchise agreement, Southland and the franchisee would

---

**4.** References to "Tr." are to the transcripts of the evidentiary hearings held on June 24 and 25, 1997; July 3 and 16, 1997; and December 2 and 3, 1997. Each transcript begins with page one; thus the citations will be preceded by the hearing date.

share in the gross profit (merchandise sales less cost of goods sold) on the $2500 in merchandise sales. June 24 Tr., at 19–20, 26–28, 84–85, 107–116, 142–43; Pl.Ex. 8.

10. The scheme at Froelich's store involved the intentional exaggeration of Instant Lotto sales. Using the previous example as the correct method of reporting, Froelich would add an arbitrary amount, in this example $300, to the actual Instant Lotto sales of $500. This exaggeration would result in the deduction of $800 of Instant Lotto sales (instead of $500) from the merchandise sales: total sales less the inflated Instant Lotto sales equals (false) merchandise sales ($3000 less inflated amount of $800 equals false merchandise sales of $2200). Thus, Southland and the franchisee would share the gross profit *only* on the $2200 in reported merchandise sales, but *not* the gross profit on the diverted $300 in merchandise sales. June 24 Tr., at 19–20, 26–28, 84–85, 107–116, 142–43; Pl.Ex. 8.

11. As a result of Froelich's intentional understatement of merchandise sales, a non-curable Notice of Termination was delivered to Froelich on February 26, 1997. Pl.Ex. 2–5.

12. The material breaches of the franchise agreement identified by Southland in the February 26, 1997 Notice were that Froelich had devised and implemented a scheme, "utilizing fraudulent Lotto 'post-voids,' ... to divert funds to your own account, which would otherwise have been part of the deposited Receipts, thereby depriving 7–Eleven of its rightful share of the Gross Profit in respect of the unlawfully diverted funds." Pl.Ex. 2–5, ¶ 3.

13. The effective date of termination was recited in paragraph 8 of the Notice of Termination as

the date of your receipt of this Notice of Material Breach and Termination, provided, however, that if it should be determined by a court of competent jurisdiction that this Notice of Material Breach and Termination is not effective immediately upon your receipt thereof, it shall be effective at 4:00 p.m., March 5, 1997 or three (3) Business Days following the delivery to you of this Notice, whichever is later.

Pl.Ex. 2–5, ¶ 8.

14. At Froelich's request, the March 5, 1997 date was deferred to March 7, 1997. Pl.Ex. 1, Affidavit of Robert Cadigan ("Cadigan Aff."), April 8, 1997, ¶ 9.

15. Southland continued to investigate Froelich's store operation, at Froelich's request, to determine whether there was any basis for Southland to change its mind regarding the termination of the franchise agreement. Cadigan Aff., ¶ 10.

16. On March 26, 1997 Froelich's attorney was notified that grounds for reconsideration of the termination did not exist, and that Southland intended to file a complaint in federal court the next day. *Id.*

17. Southland filed its complaint in this Court on March 27, 1997 and submitted an Order to Show Cause on April 8, 1997 seeking preliminary injunctive relief.

18. Southland is the largest operator and franchiser of convenience stores, with a worldwide network of over 14,000 7–Eleven company-operated and franchised locations. In the United States and Canada, there are approximately 3,000 7–Eleven stores that are operated by individuals under franchises granted by Southland. Cadigan Aff., ¶ 17.

19. Southland requires, and the franchise agreement for each store provides for, accounting systems and controls that are designed to provide accountability for the operation of the store, as well as to determine and account for the "equity" position of the franchisee, i.e., the franchisee's Net Worth in the store's operations, which the franchisee is obligated to maintain above a certain minimum level. Cadigan Aff., ¶ 17.

20. The franchisee's Net Worth is defined in the franchise agreements as "the cash register fund, the Cost Value of the Inventory, Store supplies, receivables, prepaids, refundable deposits, and any portion of the initial cost of an alcoholic beverage license employed in FRANCHISEE's operation of the Store which is charged to the Open Account and carried on the Bookkeeping Records ...; less FRANCHISEE's payables and accruals from FRANCHISEE's operation of the Store, as reflected on the Financial Summaries." Pl.Ex. 2.–2, Exh. E.

21. Southland exercises great control over the selection of store sites and their subsequent operation. For example, Southland selects the location of each store, purchases the land and constructs the store, or leases an appropriate structure, and prepares the store for operation, including the provision of all equipment necessary for it operation. Such equipment includes shelves, counters, cash registers, lighting and other fixtures, heating and cooling equipment, signs, and parking lot preparation. Cadigan Aff., ¶ 18.

22. Each store generally represents an investment by Southland of hundreds of thousands of dollars by the time it opens. Under the franchise agreement, a franchisee is leased the store and equipment, and is licensed to use the 7–Eleven Service Mark, related trademarks, trade dress and system of operations, which licenses automatically terminate upon the end of the franchise relationship. Cadigan Aff., ¶ 18.

23. Pursuant to the terms of the franchise agreement, the franchisee does not acquire ownership of the store, its premises or any of the physical plant. Rather, these remain the property of Southland. The franchisee's ownership interest is in the store's inventory, and the franchisee's primary ongoing financial interest is in the Net Income derived from the store's operations, which the franchisee draws against on a weekly basis. Cadigan Aff., ¶ 19.

24. The term Net Income is defined in the franchise agreement as "Gross Income less operating Expenses." Pl.Ex. 2–2, Exh.E.

25. Southland's financial interest is in receiving a percentage of the "Gross Profit" (Net Sales less Cost of Goods Sold) derived from operation of the store, which percentage is designated in the franchise agreement as the "7–Eleven Charge." The Net Income in which the franchisee has an interest, as mentioned above, is the amount remaining after deducting "Operating Expenses" (such as payroll and similar expenses) and the 7–Eleven Charge from the Gross Profit. Operating Expenses do not include certain store repairs, replacement of equipment, insurance, real property taxes, any rental charge, electricity, heat or other utility costs, all of which are borne by Southland. Cadigan Aff., ¶ 20.

26. In addition to providing the franchisee with a ready-to-operate store, and bookkeeping services,

Southland also, upon request, will finance the operation of the store under the terms of the franchise agreement. Most franchisees elect, as did Froelich, to utilize Southland's financing. To secure the obligation owed to Southland under such financing, a franchisee, as did Froelich here, grants Southland a security interest in the franchisee's inventory and in the premium and going value concern, if any, of the store. Cadigan Aff., ¶ 21.

27. Thus, prior to opening a store, a franchisee purchases an initial inventory, with the franchisee paying only part of the purchase price from his funds and Southland financing the balance. The amount financed by Southland and owed by the franchisee to Southland is maintained in an account known as the "Open Account." Subsequent purchases, expenses and revenues flow through the Open Account. Essentially, the Open Account is a running working capital account reflecting the cash operations of the store. The balance of the Open Account at any given time represents the amount of money that Southland has loaned or advanced to a franchisee to finance the operation of the store. Southland reserves the right to terminate its financing at any time. Cadigan Aff., ¶ 21; Pl.Exhs. 2–2 and 2–16.

28. After operation of a store commences, a franchisee must ring up accurately, on cash registers provided by Southland, all sales of merchandise (with those transactions that are subject to sales tax and those that are not being separately identified), money orders, cigarettes, all cash payments to vendors and casual labor, and all other cash transactions. Cadigan Aff., ¶ 22.

29. A franchisee also is required to deposit on a daily basis the cash received from each day's operation of the store. These deposits are made to a bank account designated by Southland and Southland credits the franchisee for the deposits which are applied in reduction of the outstanding balance of the Open Account. Cadigan Aff., ¶ 23.

30. A franchisee is further required, under the Franchise Agreement, to furnish Southland with a daily "Cash Report" indicating the amount of sales for the day, the amount of cash deposited, and any additions or *bona fide* deductions that affect the daily deposit. Cadigan Aff., ¶ 24.

31. A tape from each of the store's cash registers summarizing, by categories of its various keys, the day's entries is attached to the Cash Report. Since about mid–1995, a franchisee enters this information into a computer, which generates the Cash Report, which is then reviewed and approved by the franchisee, and transmitted to Southland's Accounting Center for processing. Cadigan Aff., ¶ 24.

32. The daily Cash Report, prepared and signed by the franchisee or his designee, is the only device used to report daily sales. When the Cash Report is received by Southland's accounting department, information from the face of the Cash Report is entered into the computerized accounting records maintained by Southland. This data entry is performed by one of Southland's data entry clerks. The information on the face of the Cash Report is not verified by Southland. Rather, Southland relies on the integrity and honesty of its franchisees in reporting the information necessary for the proper functioning of the accounting system. This pro-

cess is essential in determining the parties' respective contractual shares of gross profit. Cadigan Aff., ¶ 25.

33. When a franchisee purchases merchandise and supplies for a store, the related invoice, bill or statement may be submitted, together with a Receiving and Inventory Transactions Report, to Southland for recording and direct payment by Southland. These payments, as well as the payments made by Southland for Operating Expenses, are charged to the franchisee through the Open Account, the balance of which is increased by the amount of the expenditures. Southland will pay the related invoice, bill or statement so long as it is willing to provide Open Account financing to the franchisee. As a general rule, most of a franchisee's invoices for purchases are submitted to Southland for payment, a practice that is encouraged by Southland to aid in the accurate and orderly accounting at the store. Cadigan Aff., ¶ 26.

34. Alternatively, payment may be made by the franchisee at the store, in cash or by draft drawn on an account designated by Southland, in which case the related invoice, bill or statement must be submitted to Southland for verification and recording. If the purchase is paid by cash, it is reflected on the Cash Report (to account for the reduced amount of the deposit made to the store's bank account). The related bill, statement or invoice is turned in to Southland. Cadigan Aff., ¶ 26.

35. If the purchase is paid by draft, it is reflected on the Receiving and Inventory Transactions Report and the related invoice, bill or statement is attached along with a car-

bon copy of the draft. Cadigan Aff., ¶ 26.

36. Southland prepares monthly financial statements for each store from Southland's bookkeeping records and from information supplied by the franchisee, most notably the daily Cash Reports. The monthly financial statements include a profit and loss statement for the month and an updated balance sheet for the store. On the basis of these financial reports, the 7–Eleven Charge is calculated and Southland receives, as the 7–Eleven Charge, its share of the Gross Profits of a franchised store. The financial reports also update the outstanding balance of the Open Account. Cadigan Aff., ¶ 27.

37. Southland employs a retail method of inventory accounting system. The sheer number of items found in a typical 7–Eleven store makes the retail method of inventory accounting necessary. Cadigan Aff., ¶ 28.

38. When a 7–Eleven store commences operation, a physical count of all inventory is made and the inventory is valued initially at suggested retail selling prices. Thereafter, the inventory is valued at the actual retail selling prices as determined by the franchisee, who reports them to Southland for accounting purposes. Southland relies on the franchisee's honesty in reporting the retail selling prices. This Opening Inventory is the initial balance in the Retail Book Inventory maintained in the store's accounting records by Southland. Cadigan Aff., ¶ 29.

39. When a franchisee purchases merchandise for a store, the invoice, bill or statement is transmitted to Southland together with the value of the purchased merchandise at retail. Southland then increases

the Retail Book Inventory by the retail value of the merchandise purchased. On the other hand, sales of merchandise to customers reduce the Retail Book Inventory. Southland charges the amount of merchandise sales against Retail Book Inventory on the store's accounting records. Cadigan Aff., ¶ 29.

40. The accounting system used by Southland is almost wholly dependent upon the honesty and integrity of the franchisees in reporting to Southland the amounts and categories of sales on the daily Cash Reports. Cadigan Aff., ¶ 29.

41. To maintain the Retail Book Inventory as an accurate figure for the inventory actually present at the store, periodic physical counts of inventory are taken and any variance becomes an adjustment to the Retail Book Inventory accounting record. Southland maintains the right under the franchise agreement to conduct audits at the store. Cadigan Aff., ¶ 30.

42. Variances can arise from a number of factors, including thefts by employees or customers, sales of merchandise that are not rung up on the cash register, or falsely deflating actual merchandise sales. These variances cause Inventory Shortages, i.e., physical counts showing that less inventory actually is present than is shown on the accounting records for Retail Book Inventory. Cadigan Aff., ¶ 30.

43. Under the terms of the franchise agreement, a franchisee is responsible for all Inventory Shortages, which are charged directly to the franchisee's account at cost, not at retail value. Thus, in the event of an Inventory Shortage caused by a franchisee's selling merchandise without reflecting the sale on the store's registers, the franchisee

benefits, at minimum, from the profit margin on the merchandise (retail value less cost), i.e., the 7–Eleven Charge. Cadigan Aff., ¶ 31.

44. However, inventory shortages may be covered up in several ways. For example, the franchisee may purchase or otherwise bring merchandise into the store without submitting the related invoice, bill or statement to Southland. A physical count of inventory taken thereafter thus could match the amount shown for Retail Book Inventory in the accounting records. Another way of covering Inventory Shortages is the selling of merchandise at retail prices higher than the retail prices reported by the franchisee to Southland. Cadigan Aff., ¶ 31.

45. Unless unreported purchases of merchandise or sales of merchandise at inflated prices are "balanced" to cover only unreported revenues, there would be present in the store a greater amount of inventory than is shown on the accounting records for Retail Book Inventory. An Inventory Overage would result, and the franchisee would be credited with the amount of such overage at cost. In substance, Southland would pay the franchisee, by crediting his account, the value (at cost) of any inventory present in the store in excess of the amount shown in the Retail Book Inventory. Cadigan Aff., ¶ 32.

46. As is required by all of Southland's franchisees, Froelich was required by the franchise agreement to "deposit the Receipts [daily] in the bank or night depository designated by 7–Eleven, except cash expended by FRANCHISEE from that day's Receipts for Purchases or Operating Expenses ..." Pl. Exh. 2–2, ¶ 10.

47. Paragraph 10 of the franchise agreement also required Froelich to "prepare and furnish to 7–Eleven on forms and at times acceptable to and as requested by 7–Eleven: (i) daily summaries of Purchases, (ii) daily reports of Receipts.... FRANCHISEE also shall ... keep 7–Eleven currently advised in writing of all of FRANCHISEE'S actual retail selling prices...." Pl.Exh. 2–2, ¶ 10.

48. The requirement regarding summaries of Purchases is encompassed by the Receiving and Inventory Transactions Report and the requirement regarding reports of Receipts is encompassed by the daily Cash Report. Cadigan Aff., ¶ 33.

49. The Froelich franchise agreement defines "Receipts" as "all sales proceeds (whether cash, check, vendor draft, credit instrument, or other evidence of receipt), money order revenues, discounts or allowances received by FRANCHISEE, and miscellaneous income ... and the value of premiums received from FRANCHISEE'S operation of the Store." Pl.Exh. 2–2, Ex.E.

50. Under the heading "Franchisee's Additional Covenants," the Froelich franchise agreement also provides that "FRANCHISEE shall: ... cause all sales of Inventory to be properly recorded at the time of sale at the retail prices set by FRANCHISEE." Pl.Ex. 2–2, ¶ 17. "Inventory" is defined as "all merchandise for sale from the Store." Pl.Ex. 2–2, ex. E; Cadigan Aff., ¶ 33.

51. A franchisee's failure to accurately report and deposit Receipts (as defined) and to accurately report actual retail selling prices of merchandise are both material breaches of the franchise agreement. Pl. Exh. 2–2, ¶ 28; Cadigan Aff., ¶ 34.

52. Upon termination of the franchise agreement, a franchisee is required to "peaceably surrender the Store and Equipment ...; transfer the final inventory ... to 7–Eleven; transfer to 7–Eleven the Receipts, cash register fund, pre-paid Operating Expenses, money order blanks, bank drafts, and Store supplies; cease using the Service Mark, the Related Trademarks, and the 7–Eleven System, including the Trade Secrets; return FRANCHISEE'S copy of the Franchise Systems Manual and of the Foodservice Operations Manual; and return all Trade Secrets and other 7–Eleven System material." Pl.Exh. 2–2, ¶ 30.

53. To date, Froelich has not surrendered his Store to Southland, continues to remain in possession of the Store, and continues to use the 7–Eleven Service Mark and related trademarks. Cadigan Aff., ¶ 35.

54. On or about January 20, 1997 Southland's Customer Service Department was contacted by Mohammed Younis ("Younis"), who requested an appointment with Southland's Market Manager. On January 24, 1997 Robert Cadigan met with Younis and his friend Yousef Mohamed ("Yousef") at Southland's Market office. Younis told Cadigan that he had been a partner of Froelich's in the July 1996 acquisition of the Froelich store; that he had invested $30,000, of which $20,000 was a loan evidenced by a promissory note made by Froelich; and that, after expenses, Younis would receive 40% of the profits from the Froelich store. Cadigan Aff., ¶ 36; *see also* June 24 Tr. at 17–18, 132–34, 205–06; July 16 Tr. at 6–9, 12–14, 22–28; Pl.Exhs. 10, 13.

55. Froelich's application did not disclose either Younis's partnership interest or Froelich's indebtedness to Younis. Pl.Exh. 2–20; 2–21.

56. Both Younis and Yousef, who were friends, had worked at the Hudson store from Spring 1990 through June 1996. Younis and Froelich had a falling out—Younis and Yousef allegedly had caught Froelich stealing from Younis. Younis informed Cadigan at the January 24 meeting that Southland had been victimized at both the Hudson and Froelich stores. Younis told Cadigan that at both stores merchandise sales had been knocked down, the cash from the knocked down sales had been used to pay employees "off the books," that the Inventory Shortages had been covered up by charging customers retail prices higher than those reported to Southland, and that the sales tax in a taxable item, together with the price of the item, had been lumped together and rung up, falsely, as a non-taxable sale. Cadigan Aff., ¶ 37; June 24 Tr. at 17–21, 26–30, 84–85, 109–114, 135–37, 141–44, 147–49, 183–87, 209–14; June 25 Tr. at 16–17, 22–24, 44–46, 74–75; Pl.Exhs. 5, 6, 8, and 15.

57. These activities apparently had occurred at the Froelich store since Instant Lotto was placed in the store in September 1996. Cadigan Aff., ¶ 38.

58. The cash registers used in the stores in the Market have separate keys for different transactions. Merchandise sales are divided into taxable and non-taxable categories and there is a separate key in which Instant Lotto sales are rung up. Each store has two cash registers and there are three eight-hour shifts that comprise the 24–hour period covered by a daily Cash Report. Once a day the franchisee or his designee compiles the activity on each register for the three most recent eight-hour shifts. Cadigan Aff., ¶ 38.

59. The money collected by a franchisee from Instant Lotto sales, except for a small commission, is held in trust for the State Lottery commission. In order to determine total merchandise sales (the gross profit on which is shared by Southland and its franchisees), Instant Lotto sales must be deducted from Total Sales. Cadigan Aff., ¶ 39; June 24 Tr. at 26–28, 51–56, 84–85.

60. However, the preparer of a Cash Report may falsely understate merchandise sales simply by post-voiding (or deducting) more Instant Lotto Sales than actually were made. As a result, merchandise sales are understated, and Southland loses its contractual share of the Gross Profit on the understated sales; the Inventory Shortages that flow from unreported sales of merchandise inventory could be covered up by charging customers for fictitious purchases and by selling merchandise at prices higher than the price reported to Southland. Each part of this type of scheme would be a breach of the franchise agreement. Cadigan Aff., ¶ 40.

61. Both Froelich and Younis worked at the Froelich store. Froelich generally prepared the Cash Reports five days per week, while Younis prepared them on the two days Froelich was off. Cadigan Aff., ¶ 41. Because Younis had received only modest distributions of profit from Froelich, given that he had a 40% interest in the store, Younis complained to Yousef. Yousef suggested that Younis review the Instant Lotto post-voids at the Froelich store. Cadigan Aff., ¶ 41; June 24 Tr. at 208–14; July 16 Tr.

at 10–16. Sometime in November 1996, Younis reviewed the post-voids and found that Froelich had post-voided about $5300 of Instant Lotto sales in excess of actual Instant Lotto sales. Cadigan Aff., ¶ 41 June 24 Tr. at 209–12; July 16 Tr. at 17–20.

62. When Younis confronted Froelich, Froelich told Younis not to worry because he had the money; Froelich thereafter gave Younis his 40% interest on the understated profits, but their relationship terminated sometime in December 1996. Cadigan Aff., ¶ 41; June 24 Tr. at 212–14; July 16 Tr. at 20–23, 28.

63. Following the January 24, 1997 meeting, Southland spot checked the Cash Reports, with their attached summary cash register tapes, at both the Hudson store and the Froelich store. Southland also secretly shopped both stores to determine whether the prices charged at the stores were consistent with the retail prices reported by the stores to Southland. These spot checks confirmed the excess post-voids of Instant Lotto sales. Cadigan Aff., ¶ 42; June 24 Tr. at 18–21, 29–36, 38–39; Pl.Exhs. 4–6.

64. When Froelich's store was operated by the prior franchisee, the percentage of taxable sales to total merchandise sales was slightly above the Market average. In contrast, after Froelich assumed operation of the store in July 1996, the percentage of taxable sales to total merchandise sales was significantly below the Market average, and below that which the prior franchisee had collected as taxable sales. June 24 Tr., at 38–39.

65. Following a meeting on February 7, 1997 (between Cadigan, Younis, Yousef, Southland's attorney and a financial analyst), a review was made of all Cash Reports and attached cash register summary tapes at the Froelich store from September 1996 (when Instant Lotto sales commenced) to January 1997. Southland also reviewed the reports and summaries at the Hudson store. Cadigan Aff., ¶¶ 43–44.

66. At the Hudson store, during a 37–month period (January 1994 to January 1997), an aggregate of $139,-268.20 was post-voided in excess of actual Instant Lotto sales. Cadigan Aff., ¶ 44.

67. At the Froelich store, during the 5–month period reviewed, an aggregate of $6463.50 was post-voided in excess of actual Instant Lotto sales. Cadigan Aff., ¶ 44; June 24 Tr. at 65, 106–114; Pl.Exh. 8.

68. During this same period of time, Froelich's store experienced Inventory Overages of about $5024 at retail price from July 1996 through December 1996. Cadigan Aff., ¶ 45; June 24 Tr. at 88–90.

69. Secret shops at the Froelich store confirmed that a number of items purchased during the shops were at prices higher than those reported to Southland. In most instances, the excess prices ranged between $.10 and $.60 per item. In all, 76% of the items purchased by Southland in its secret shops were purchased at prices higher than those prices reported to Southland. June 24 Tr. at 34–36; Pl.Exh. 6; Cadigan Aff., ¶ 46; June 24 Tr. at 20–21, 29–36, 40; Pl .Exhs. 4–6.

70. Froelich personally participated in the sale of merchandise at his store at prices higher than those prices reported to Southland. June 24 Tr. at 148–49; Pl.Ex. 5.

71. Froelich conceded that he had engaged in activities to defraud Southland at his store. June 24 Tr. at 162–65, 175–177. He was personally aware that there were ex-

cess post-voids occurring in his store. *Id.* at 175. Froelich personally benefitted from these activities. *Id.* at 164.

72. On March 7 and May 6, 1997, Froelich, in the presence of his attorney, provided sworn statements to Southland and its attorneys. Pl. Ex. 3; Cadigan Aff., ¶ 53. Froelich admitted his participation in the scheme at the Hudson store. Pl. Ex. 3, at 52–62. Froelich testified that, while he worked at the Hudson store, Hudson was concerned about "pulling" enough money from the store to pay employees, including Froelich, "off the books," and to make up for the Inventory Shortages by overcharging customers and by ringing up taxable sales as non-taxable sales. *Id.* at 47–49, 84–92, 96–101, 141–43, 169.

73. Froelich also admitted, among other things, that he had post-voided excess Instant Lotto sales at his own store. *Id.* at 144–45.

74. During the time that Froelich managed the Hudson store, he instructed employees how to "make up money," including how to charge customers amounts for merchandise not actually purchased and to charge customers prices higher than those reported to Southland. June 24 Tr. at 183–87; Pl.Exh. 15.

75. During Froelich's last year as manager of the Hudson store, the post-voids totaled approximately $1100–1200 weekly. June 24 Tr. at 136–37. Froelich was aware that the money being "pulled" from the Hudson store came from merchandise sales. June 24 Tr. at 137.

76. Froelich was aware that taking cash from the store by excessive Instant Lotto post-voids would generally result in inventory shortages. He also was aware that there were not actual inventory shortages at the Hudson store. June 24 Tr. at 143–44.

77. An examination of Froelich's business and lottery bank accounts revealed that Froelich paid Younis thousands of dollars therefrom. Froelich knew that if he had not siphoned cash from merchandise sales to deposit into the business/lottery account, he would have had to use his personal funds to pay Younis. June 24 Tr. at 169–70; Pl.Exh. 14.

78. In an apparent effort to shield his activities, Froelich post-voided in small amounts to avoid detection. June 24 Tr. at 95.

79. The State Lottery Commission notifies the Froelich store by an electronic terminal, generally, the amounts payable to the commission several days prior to the date that the account is to be "swept." If there is a shortfall in the amount of funds in the lottery account, a franchisee is not permitted to deduct the funds from merchandise sales at the store. June 24 Tr. at 115–16.

80. Froelich had the ultimate responsibility to determine whether prices of merchandise being sold at his store were at the prices reported to Southland. June 25 Tr. at 46. Froelich acknowledged that it was his responsibility to monitor his employees. June 25 Tr. at 73–74. Froelich had represented to Southland that he had tremendous knowledge of 7–Eleven and its operations, that he enjoyed being hands-on even though he had good employees, that it was important to retail bills correctly, and that Froelich would spot-check any paperwork done by anyone else. June 25 Tr. at 74–75.

81. Although he was subpoenaed to appear in court on July 3, 1997, Younis did not appear because allegedly

he had been threatened by a person named "Malik," an individual who used to work with Froelich at the Hudson store and at Froelich's own store. July 16 Tr. at 30–36.

82. By its Notices of Termination and its follow-up written and oral demands, Southland demanded (a) repayment by Froelich of his Open Account indebtedness to Southland; (b) return of the store premises and equipment; and (c) if the Open Account indebtedness was not repaid, possession of Froelich's inventory, proceeds and other collateral that secure Froelich's Open Account indebtedness. Cadigan Aff., ¶ 56.

83. Froelich refused Southland's demands in all respects and Froelich continues to be in possession of, and sell, Southland's collateral securing Froelich's Open Account indebtedness. Cadigan Aff., ¶ 56. Froelich continues to hold himself out as a 7–Eleven franchisee. *Id.*

84. During the application process to become a 7–Eleven franchisee, Froelich did not disclose that he had a partner. June 24 Tr. at 41.

85. The goodwill payment of $125,000 made by Froelich to the prior franchisee was not shared with Southland, which has no role in negotiating the goodwill purchase price. June 24 Tr. at 41. Froelich also paid a franchise fee to Southland which totaled approximately $77,500. *Id.* at 42. Twenty-five percent of the franchise fee paid to Southland went to the prior franchisee. *Id.*

86. During the qualification process to become a franchisee, Froelich, in writing, represented to Southland that his "premium or goodwill payment will have no effect on [his] right or the right of [Southland] to terminate [Froelich's] agreement pursuant to its terms." June 24 Tr. at 128–131; Pl.Exh. 9.

87. Although new franchisees normally go through nine weeks of in-store training and another week of classes in Dallas, Froelich requested and was granted a training waiver because of his experience as manager of the Hudson store for more than ten years. Froelich participated in a "test-out" program in which a Southland representative, on a regular basis, evaluated Froelich's knowledge of the material taught in the training class. June 24 Tr. at 42–46.

88. The total amount of Southland's losses due to Froelich's allegedly fraudulent activities is in the vicinity of $6000 to $7000. June 24 Tr., at 93–94.

## DISCUSSION

### I. Analysis of Preliminary Injunction Factors

By seeking a preliminary injunction that would bar Froelich from using its trademarks, service marks, and trade dress during the pendency of this action, Southland clearly seeks relief that would alter the status quo, rather than maintain it. This requested alteration of the status quo is even more apparent when one considers that Southland also seeks to compel Froelich to surrender possession of the Peconic Street store and its inventory pending the outcome on the merits. Moreover, the Court finds that the relief requested by Southland on its preliminary injunction application is substantially all the relief sought by the complaint, and that the relief sought cannot be undone if Froelich were later to succeed on the merits at trial. Thus, the Court must consider not only irreparable harm, but also must require Southland to meet a heightened standard by demonstrating that there is a "clear" or "substantial" likelihood that it

will succeed on the merits[5] of its claims. *See Cavanagh*, 155 F.3d at 136.

### A. Irreparable Harm

#### 1. Trademark Infringement

■ "The unauthorized use of a [trade]mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark." *Church of Scientology Int'l v. Elmira Mission*, 794 F.2d 38, 43 (2d Cir.1986). In the trademark infringement context, "a showing of likelihood of confusion establishes ... irreparable harm." *Hasbro Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988); *see also Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987) (same). Moreover, a court must find irreparable harm when the movant "shows that it will lose control over the reputation of its trademark pending trial." *Church of Scientology*, 794 F.2d at 43 (quoting *Power Test Petroleum Distrib. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir.1985) (citing 2 McCarthy, *Trademarks and Unfair Competition* § 30.15 (2d ed.1984))).

Pursuant to the franchise agreement between Southland and Froelich, the latter was licensed to use the former's 7–Eleven service mark, 7–Eleven system, and the 7–Eleven trade dress and trade secrets. Pl. Ex. 2–2, ¶ 5. Southland alleges that the franchise agreement, and hence, the license to use the trademarks, was terminated by a non-curable Notice of Termination dated February 26, 1997.

During the pendency of the evidentiary hearings and decision on its first order to show cause, Southland issued two Supplemental Notices of Material Breach and Termination to Froelich, dated June 24, 1997 and October 17, 1997. In its arguments to the magistrate judge, Froelich vehemently contested the validity of each of these notices of termination. *See* De-

fendant Richard Froelich's Post–Hearing Brief, dated December 8, 1997, at 3–5. Froelich contends that Southland has attempted to manufacture a case in order to discredit him and to terminate the franchise agreement. *Id.*

Thus, whether there is, in fact, any irreparable harm to Southland as a result of Froelich's alleged infringement of Southland's trademarks, service marks and trade dress depends on whether Froelich's use of Southland's marks is unauthorized. Whether Froelich's use of Southland's marks is unauthorized depends on the validity of Southland's termination of the franchise agreement with Froelich. If the franchise agreement was properly terminated, Froelich's license, i.e., his privilege, to use Southland's marks, also was revoked, and irreparable harm is established as a matter of law. On the other hand, if the franchise agreement was not properly terminated, then Froelich's license to use Southland's marks remains intact. This issue is considered *infra*.

#### 2. Interference with Real Property Rights

■ A real property owner's inability to make productive use of its own property may constitute irreparable harm. *Persaud v. Exxon Corp.*, 867 F.Supp. 128, 141 (E.D.N.Y.1994) (Seybert, J.). Irreparable harm in this context flows from the owner's inability to make better use of the site, or the owner's lack of control over features, fixtures, and equipment located on the site. *Id.; see also Shell Oil Co. v. Altina Assoc., Inc.*, 866 F.Supp. 536, 541–42 (M.D.Fla.1994) (ordering terminated service station operator to vacate leased premises); *Shell Oil Co. v. Czar*, Civ. No. N–88–38, 1988 WL 404539, at *6 (D.Conn. Apr.19, 1988) (same).

Under the franchise agreement, Froelich leased the store and its equipment from Southland. Pl.Ex. 2–2, ¶ 6. The par-

---

5. There is no difference in meaning between a "clear" and a "substantial" likelihood of suc-

cess on the merits. *Tom Doherty Assoc.*, 60 F.3d at 34.

ties' intentions were to create only a landlord-tenant relationship. *Id.* The agreement further provides that in the event of a breach by Froelich, Southland was entitled "to invoke all rights and remedies, judicial and otherwise, available to a landlord, including summary proceedings for possession of leased property ... [or] to terminate, cancel, or declare a forfeiture of the lease." *Id.* Thus, by the plain language of the agreement, in the event of a breach by Froelich, Southland is authorized to take possession of its property and equipment.

The February 26, 1997 termination notice issued to Froelich by Southland informed Froelich that upon the effective date of the termination of the agreement, the lease and/or sublease of the store and its equipment also would terminate. Pl. Ex. 2–5, ¶ 6. The June 24, 1997 notice and the October 17, 1997 notice contained language indicating that Froelich was to "surrender and turn over possession of any and all rights in and to the Premises to 7–Eleven" upon the effective date of the termination. Pl.Exs. 20–1, 20–2, ¶ 7. As mentioned previously, Froelich contests the validity of these three termination notices.

Whether there is any irreparable harm to Southland's real property rights depends on whether the termination notices were valid. If the agreement was properly terminated, then Froelich's right of possession of the premises also was terminated, and he had an affirmative obligation to surrender the premises and inventory to Southland. However, if there was no valid termination of the agreement, then Froelich's right of possession remained in force, and Southland has suffered no irreparable harm. This issue is also discussed *infra.*

B. Substantial Likelihood of Success on the Merits

1. Trademark Infringement

■ "In a Lanham Act case a showing of likelihood of confusion establishes ... a likelihood of success on the merits...." *Hasbro, Inc.,* 858 F.2d at 73. In the licensing framework, where the alleged unauthorized user of the trademark continues to use the identical, previously licensed trademark, after revocation of the license, likelihood of confusion is established. *Church of Scientology,* 794 F.2d at 44–45; *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 375 (3d Cir.1992) (concurrent use of the same mark by franchiser and terminated franchisee is highly likely to cause consumer confusion about affiliation with franchise); *Seligco Food Corp. v. Atlantic Processing, Inc.,* 214 U.S.P.Q. 624, 629 (E.D.N.Y.1981) (Mishler, J.) ("[u]se of the mark after termination of the licensing agreement, by definition, constitutes trademark infringement."); *Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of New York, Inc.,* 423 F.Supp. 975, 978 (E.D.N.Y.1976) (Mishler, J.) ("continued misrepresentation that the [terminated licensee] is still part of the franchiser's organization will cause further confusion in the public mind").

Here, Froelich's right to use Southland's trademarks was created by the franchise agreement. The valid termination of that agreement would also terminate Froelich's right to use the marks. *Coit Drapery,* 423 F.Supp. at 978. Therefore, the likelihood of confusion, and thus whether Southland is substantially likely to succeed on the merits of its trademark infringement claim, is dependent upon whether the franchise agreement was validly terminated.

2. Interference with Real Property Rights

The same principle discussed above is also determinative here. Froelich's right to possess the real property at issue was created by the franchise agreement, and likewise is terminated by the valid termination of the agreement. Whether Southland is substantially likely to succeed on the merits of its claim of interference with real property rights thus depends on the

validity of the termination of the agreement.

## II. Termination of the Franchise Agreement

 Southland's objections, although numerous,[6] can be narrowed down to one simple argument: Southland argues that it was entitled to terminate the franchise agreement without opportunity for cure because the material breaches committed by Froelich went to the core or essence of the contract, and thus termination was justified under the fraudulent circumstances presented. Pl. Obj., at 59–70.

This Court agrees with Southland's argument. Without actually deciding the precise date of the termination of the franchise agreement, the Court finds that Southland has established a substantial likelihood of success on the merits of its claim that the franchise agreement was terminated, and that it was entitled to terminate the contract without opportunity for cure. Pursuant to the franchise agreement, and under common law principles, the agreement was terminated at the very latest in October, 1997.

As a result of this determination, Southland has established that it is substantially likely to succeed on the merits of its trademark infringement claim and on its claim of interference with real property. Southland also has demonstrated the requisite irreparable harm flowing from the unauthorized use of its trademarks and the unauthorized possession of its real property. Thus, plaintiff's application for a preliminary injunction pending the resolution of this case will be granted.

### A. Southland's Notices of Material Breach and Termination

Paragraph 28 of the franchise agreement contains detailed language concerning the termination of the agreement by Southland. Pl.Ex. 2–2. This paragraph includes numerous breaches, which, if committed by the franchisee, provide Southland with the right to terminate. As the magistrate judge pointed out, prominent in that paragraph are provisions requiring Southland to give the franchisee notice of any material breaches and giving the franchisee the right to cure. *See* Report and Recommendation ("R & R"), at 15–16. This opportunity to cure applies to virtually all material breaches, unless the franchisee has received two notices of material breach within the three-year period immediately preceding a third notice of material breach. In the case of a third notice of material breach within a three-year period, there is no right to cure.

The first notice of material breach and termination sent by Southland to Froelich was dated February 26, 1997. In this notice, Southland described the scheme by which Froelich used fraudulent Lotto "post-voids" to divert funds from the store's deposited Receipts, which thereby deprived Southland of its contractual share of gross profit. Pl.Ex. 2–5, ¶ 3. Southland also indicated that the resulting inventory shortages were covered up by Froelich by selling merchandise at prices higher than those reported to Southland. *Id.* Southland estimated, at that time, that it had been deprived of its share of approximate-

---

**6.** In support of its objections, Southland filed two volumes of evidentiary exhibits, 578 pages of transcript testimony, and a 73–page memorandum detailing its objections to the report and recommendation of the magistrate judge. Despite the fact that my individual rules at that time limited briefs to twenty pages, the Court granted Southland's application, *nunc pro tunc*, to file an overlength brief. With hindsight, the Court should have denied the application to file this lengthy memorandum, which drastically increased the amount of time needed to uncover the essence of Southland's objections and rule on them. Additionally, the memorandum is filled with unnecessary attacks on Magistrate Judge Pohorelsky, through which the Court was required to trudge, which further delayed this ruling. *See, e.g.,* Plaintiff's Objections, at 1–4, 10 & n. 8, 17. As discussed in this Section, *infra*, Southland's argument is quite simple, and could easily have been fit within the allotted twenty pages with the exercise of discipline by counsel.

ly $7500 of diverted Receipts. *Id.* As a result of what it termed "willful, fraudulent, intentional activities" on Froelich's part, Southland advised Froelich that these breaches violated "the very core of the contractual relationship," and gave notice to Froelich that the agreement was terminated. *Id.*, ¶ 4. Thus Southland, rather than relying on paragraph 28 of the Agreement to terminate the agreement, asserted its alleged right to rescind based on common law principles. Paragraph 28 was not mentioned at all in the February 26, 1997 notice of termination. Southland also notified Froelich that the breaches "may not be cured." *Id.*

Regarding the allegations in this notice of termination, the magistrate judge found that an aggregate of $6463.50 of excess instant Lotto sales were post-voided at the Froelich store during the five-month period ending January 31, 1997. R & R, at 9. The Froelich store reported an inventory overage of $5024. *Id.* During the three-year period ending January 31, 1997 at the Hudson store (a period of time during which Froelich had managed and was employed by the Hudson store), an aggregate of $139,268.20 in excess Lotto sales had been post-voided. *Id.* The Hudson store, during this period of time, had inventory overages of $23,580. *Id.*

Froelich admitted that he had knowledge of various fraudulent activities at the Hudson store, but argued—in the face of clear evidence to the contrary—that he had not engaged in those activities at his own store. Froelich testified that the funds obtained through the Lotto post-void scheme at his own store were used to pay obligations to the state lottery commission. Significantly, the magistrate judge also stated that he "was not particularly persuaded by the testimony" Froelich gave during the evidentiary hearings. R & R, at 17 and 19.

Southland issued a supplemental notice of material breach and termination to Froelich on June 24, 1997. Pl.Ex. 20–1. This notice detailed Froelich's "acceptance of secret cash rebates from ... various vendors ... which [Froelich] failed to disclose to or deposit in a bank account designated by 7–Eleven." Pl.Ex. 20–1, ¶ 3. The notice also pointed out the defendant's submission to 7–Eleven falsely inflated invoices that did not accurately reflect the true cost of merchandise purchased. *Id.* Once again, 7–Eleven did not rely on paragraph 28 of the agreement, but instead stated that the listed breaches were "willful, fraudulent, intentional activities ... that constitute[d] Material Breaches of the Agreement and violate the very core of the contractual relationship." *Id.*, ¶ 4.

Magistrate Judge Pohorelsky found that Froelich essentially admitted having participated in this kickback scheme and that the testimony about Froelich's participation was unrebutted. R & R, at 11. Moreover, the record is clear that Froelich discussed with these vendors the fact that the invoices were to be inflated by ten percent, prior to the first issuance of an inflated invoice. Pl.Ex. 3, at 217–18. Inflated invoices were given on a weekly basis for four weeks. *Id.*, at 217.

Southland issued another supplemental notice of material breach and termination on October 17, 1997. Pl.Ex. 20–2. This notice, of course, was the third in a ten-month period. This notice of material breach accused Froelich of selling significant quantities of high volume categories of merchandise at prices higher than the retail prices reported to 7–Eleven. *Id.* ¶ 3. Again, 7–Eleven stated that it considered the breaches to be "willful, intentional activities ... that constitute[d] Material Breaches of the Agreement and violate[d] the very core of the contractual relationship." *Id.*

The magistrate judge described the breaches alleged in the October 17, 1997 Notice, finding that in twenty-eight of forty-four secret "shops" conducted at Froelich's store, at least one item was purchased at a price higher than that reported to Southland. R & R, at 12. The magis-

trate judge also found that many of the "shops" involved repeating purchases of the same item on different days. *Id.* Most of the price differences were in the $.10 to $.30 range. *Id.*

Regarding these "shops," Southland points out that the Froelich store was shopped forty-four times over twenty-nine days in five different months, and that over forty-six products were purchased. Pl.Ex. 21–1 and 23. Fifteen of the forty-six products were sold at prices higher than those reported to Southland. Given the extent of the evidence supporting Southland's claims of material breach, the Court holds that, in each of these notices, Southland was within its rights as a franchiser to rescind the contract without opportunity to cure. Therefore, the franchise agreement between Southland and Froelich was terminated no later than October 20, 1997.

### B. Common Law Rescission

 The reason that Southland was entitled to rescind the agreement, despite the apparent restrictions of paragraph 28, is found in the common law contract principle that holds that a material breach that goes to the root of the matter or the essence of the contract constitutes grounds for rescission without opportunity to cure. *Southland Corp. v. Mir,* 748 F.Supp. 969 (E.D.N.Y.1990) (Mishler, J.). Southland argues that Froelich's actions were of a sufficiently serious nature that the breaches frustrated the essential purpose of the agreement and went to the core of the franchise relationship. As such, Southland contends that its termination of the agreement, without opportunity for cure, was appropriate and lawful.

This Court agrees that the principles of common law rescission of a contract under New York law, as discussed and applied in *Mir,* apply to the facts presented here. First, the fact that "fraud" was not included in paragraph 28's list of material breaches does not prevent the parties from having intended that termination for fraud

was nevertheless contemplated by the agreement. *See Mir,* 748 F.Supp. at 983. "Unless a contract provision for termination for breach is in terms exclusive, it is a cumulative remedy and does not bar the ordinary remedy of termination for 'a breach which is material, or which goes to the root of the matter or essence of the contract.'" *Id.* (quoting *Olin Corp. v. Central Indus., Inc.,* 576 F.2d 642, 647 (5th Cir.1978)) (citations omitted). There is nothing in paragraph 28 of the franchise agreement that indicates that the contract could only be terminated for the reasons stated therein.

Southland argues that the fraud allegedly committed by Froelich, including the Lotto post-voids, the invoice kickbacks, and selling prices higher than those reported to Southland, is fraudulent conduct that goes to the very essence of the contract. Fraud is "[a] false representation of a matter of fact, whether by words or by conduct, by false or misleading allegations, or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal detriment." Black's Law Dictionary 660 (6th ed.1990). Froelich's actions here indicate that Southland is substantially likely to succeed on the merits of its claim that Froelich committed fraud, which, in turn, justified Southland's termination of the franchise agreement without opportunity for cure. *See L.K. Comstock & Co. v. United Eng'rs & Constructors, Inc.,* 880 F.2d 219, 232 (9th Cir.1989) (holding that party may rescind contract, despite clause governing its termination, where breach frustrates the purpose of the agreement). Thus, the question squarely is presented: did the alleged breaches of the franchise agreement by Froelich violate Southland's rights under the contract such that the breaches go to the root of the matter or essence of the contract?

As in *Mir,* which also interpreted a contract between Southland and its franchisees, the franchise agreement here implies

a covenant not to engage in schemes or gimmicks that deprive Southland of its contractual share of the gross profit. *See Mir,* 748 F.Supp. at 983–84. "In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits. of that contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933); *see also* Restatement of Contracts 2d, § 205 ("[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

Southland's contractual share of the gross profit is 52%. Pl.Ex. 2–2, Exh.D, ¶ (j). The magistrate judge found that Froelich had post-voided Instant Lotto sales, which resulted in an understatement of total merchandise sales. R & R, at 10–11; *see also* Pl.Ex. 3, at 144–45. The intentional understating of merchandise sales, for any reason, deprives Southland of its proper share of the store's gross profit.

The magistrate judge also found that during the five-month period ending January 31, 1997, an aggregate amount of $6463.50 in excess of actual instant lotto sales at the Froelich store was post-voided. *Id.,* at 9. The magistrate judge further found that Froelich had admitted to participating in a kickback scheme with two vendors and failing to report the kickbacks

to Southland. *Id.,* at 11. This evidence, despite Froelich's after-the-fact explanations for his conduct (which the magistrate judge described as "not particularly persuasive") clearly establishes that Froelich knowingly and willingly deprived Southland of its right to 52% of the gross profit to which it was entitled under the agreement.

Having found substantial evidence of the repeated violation of the franchise agreement by Froelich, the Court holds that these violations, under New York law, go to the "root of the matter or essence of the contract." *See Mir,* 748 F.Supp. at 984; *see also Wisser Co. v. Mobil Oil Corp.,* 730 F.2d 54, 59 (2d Cir.1984) (under Petroleum Marketing Practices Act, franchisee's selling of misbranded gasoline was a breach so serious that it undermined the entire contractual relationship, eliminating opportunity to cure). It is clear that the nature of the breaches, occurring over at least five-month span of time at Froelich's store (and for years before that under Froelich's watch at the Hudson store), are such that the relationship between Southland and Froelich has been altered irrevocably and cannot be revived. Southland has been deprived of its contractual right to receive "the fruits of [its] contract" with Froelich. *See Kirke La Shelle,* 263 N.Y. at 87, 188 N.E. 163. Thus, Southland was entitled to terminate the agreement, without opportunity to cure, for the reasons set forth in each of its notices of material breach and termination.[7] *See S & R Corp.,* 968 F.2d

---

7. The magistrate judge accepted the principle that common law permits rescission of the franchise agreement without the right to cure for breaches not listed in the franchise agreement. R & R, at 19. He distinguished *Mir* on the bases that (1) the *Mir* defendants did not contest their involvement in the fraudulent scheme, and (2) the scheme in *Mir* involved more money and continued for a greater period of time. The magistrate judge also stated that while the evidence clearly established receipt of kickbacks by Froelich, the financial impact on Southland was not clear. However, whether conduct is fraudulent, and thus can serve as a basis for rescis-

sion, does not depend on whether the alleged violator chooses to challenge his involvement in the fraud. Moreover, while the amount of money and the time period involved are relevant to the determination whether fraud does or does not exist, the amounts here were in the thousands of dollars and the fraud had continued for at least five months. In any event, Southland was contractually entitled to 52% of the gross profit of the store; any underreporting of that amount goes to the heart of the contractual arrangement. Southland is not required to wait until a franchisee runs the well dry before taking action to terminate the contract. Finally, Southland was

at 375, 377 (holding that dispute over termination of franchise agreement does not prevent issuance of preliminary injunction and that franchiser has independent ability to determine whether termination is appropriate). Thus, having determined that the termination of the franchise agreement was valid, the Court finds that Southland is substantially likely to succeed on the merits of its claims of trademark infringement and violation of real property rights, and that it has shown irreparable harm on both of these claims. Southland's application for a preliminary injunction is GRANTED.

### III. Southland's Application for an Order of Seizure

■ Southland also seeks an order permitting it to replevy the secured inventory and proceeds of the Froelich store. *See* Order to Show Cause, April 9, 1997, ¶ 2. In particular, Southland seeks an order seizing from the defendant all of the goods held for sale at the Froelich store and all of the equipment formerly leased by Southland to Froelich. *Id.*

Rule 64 of the Federal Rules of Civil Procedure governs this request. The rule states, in relevant part, that

> all remedies providing for seizure of . . . property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held. . . . The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies.

Fed.R.Civ.P. 64. The issuance of an order of seizure for chattels in New York is governed by Article 71 of the CPLR.

Upon the opening of his store, Froelich was provided financing by Southland for its operation. Pl.Ex. 2–2, Exh.D. To se-

cure the obligation owed to Southland, Froelich granted Southland a security interest in the store's inventory. Pl.Ex. 2–16. The amount financed was placed in the Open Account, the balance of which represents the amount of money that Southland has loaned or advanced to the franchisee. Pl.Ex. 2–2, Exh.D. Southland reserves the right to terminate its financing at any time. Cadigan Aff., ¶ 21; Pl. Ex. 2–2 and 2–16.

Upon termination of the Franchise Agreement, franchisees are required to

> [p]eaceably surrender the store and equipment . . .; transfer the final inventory . . . to 7–Eleven; transfer to 7–Eleven the Receipts, cash register fund, prepaid Operating Expenses, money order blanks, bank drafts, and store supplies; cease using the Service Mark and the 7–Eleven System, including the Trade Secrets; return FRANCHISEE'S copy of the "Franchise Systems Manual"; and return all Trade Secrets and other 7–Eleven System material.

Pl.Exh. 2–2, ¶ 30. The Court has determined, *supra,* that the franchise agreement between Southland and Froelich terminated no later than the end of October 1997. Froelich remains in possession of the store and its inventory, despite the language of the franchise agreement which governs surrender of the premises, inventory and equipment following termination.

■ The Security Agreements provide Southland with the right to repossession of the inventory. Pl.Ex. 2–16, ¶ 5; *see also* N.Y. U.C.C. § 9–503 ("[u]nless otherwise agreed a secured party has on default the right to take possession of the collateral."); *In re Yale Express Sys., Inc.,* 370 F.2d 433, 437 (2d Cir.1966); *Mir,* 748 F.Supp. at 986–87; *Honeywell Info. Sys., Inc. v. Demographic Sys., Inc.,* 396 F.Supp. 273, 277 (S.D.N.Y.1975). To establish a cause of action under Article 71, a plaintiff must

---

not required to specify its damages in detail in order to obtain injunctive relief; it is sufficient that it is entitled to 52% of the gross

profits, and that in light of Froelich's activities, it was being deprived thereof.

show that it has an immediate and superior right to possession of the goods. *Dubied Mach. Co. v. Vermont Knitting Co.*, 739 F.Supp. 867, 872 & n. 4 (S.D.N.Y.1990) (quoting *De Weerth v. Baldinger*, 658 F.Supp. 688 (S.D.N.Y.) *rev'd on other grounds*, 836 F.2d 103 (2d Cir.1987)).

Given Southland's termination of the franchise agreement, Southland has satisfied the prerequisite for the issuance of an order of seizure. Thus, the application for an order of seizure is GRANTED.

IV. Issuance of a Preliminary Injunction and Order of Seizure

Southland is directed to submit a proposed order of preliminary injunction and seizure to the Court, in compliance with Federal Rules of Civil Procedure 64, 65(c), and 65(d), within five (5) days of receipt of this Memorandum and Order. In accordance with Fed.R.Civ.P.64, the Court conditions the issuance of an order of preliminary injunction on Southland's giving of security in the amount of $75,000.

In the interim period, Froelich is ORDERED not to interfere with the real property, inventory, or other chattels that are the subject of this Memorandum and Order or of Southland's April 9, 1997 Order to Show Cause. Froelich also is ORDERED not to interfere with Southland's rights under the franchise agreement, the security agreement, any other agreement between he and Southland. Froelich is further ORDERED to perform no acts inconsistent or otherwise not in harmony with this Memorandum and Order.

*CONCLUSION*

For the reasons stated above, the Court ADOPTS IN PART the Report and Recommendation of Magistrate Viktor V. Pohorelsky, dated February 26, 1998.

Southland's application for a preliminary injunction and an order of seizure is GRANTED. Froelich's application for a preliminary injunction is DENIED. Orders to issue.

SO ORDERED.